WALLACE JOHNSON, Respondent, v. HENRY MONELL, impleaded, etc., Appellant.

In the absence of satisfactory explanations, it is not a violent presumption to infer, that a man who stops payment to-day, because he is hopelessly insolvent, must have known and contemplated it six days before. Per MORGAN, J.

In order to establish fraud in the purchase of goods, it is not necessary that the purchaser should have made false statements concerning his pecuniary ability, by which the credit was obtained.

The fraud consists in the purchase with intent not to pay, and this intent may be proved by facts and circumstances as well as by the affirmative declarations of the purchaser, as to his pecuniary condition.

Where evidence is furnished affording a presumption of fraud, the case should be submitted to the jury.

It is only where the evidence of circumstances fails to establish a presumption of fraud, that evidence of false representations becomes indispensable to prove the purchase fraudulent.

The usuage between parties in their dealings together for a period of years, is competent evidence in the case of an alleged fraudulent purchase of goods, as tending to show that the seller had a right to presume the solvency of the purchaser, when he gave the order for goods in the usual way.

THIS action was brought to recover possession of a quantity of clover and timothy seed, sold and delivered by the plaintiff, residing at Buffalo, to the firm of Warren & Co., residing at Batavia; and by the latter firm transferred by general assignments to the defendants, Henry Monell and Henry B. Crompton. Warren & Co. were dealers in grain, produce and cattle, and had done business with the plaintiff, who was in the produce business for about four years, and he had shipped goods to them on request by correspondence several times prior to the sale of the goods in question. The general usage of the firm, as sworn to by the plaintiff, under the objection and exception of defendant, was to pay for the goods in cash after sufficient time had elapsed to inspect them. The goods were shipped by the plaintiff by way of the New York and Erie railroad. The goods in question were sold by correspondence. On the 27th Decem-

ber, 1859, Warren & Co. telegraphed to the plaintiff to give
his lowest prices for one hundred bushels prime clover seed,
and one hundred bushels prime timothy seed. The plaintiff
on the same day wrote to them, giving his prices, and offered
to send the seed on receipt of a telegram. On the 29th of
December Warren & Co. telegraphed to plaintiff that they
would take one hundred bushels of each, as per his letter.
The plaintiff shipped the seed to Warren & Co. on the
afternoon of that day, and sent a bill with the prices. On
the same day Warren & Co. wrote to the plaintiff to send
them the seed and draw on them at one day's sight; " or," say
they, " we will send you the amount the first of the week
coming." This letter was received by the plaintiff the next
day, about twelve o'clock, after the seed was sent forward.
The seed reached Batavia December 30th, and remained in
the cars of the railroad company two or three days, and was
then taken into the warehouse. On the 4th of January,
1860, the firm of Warren & Co. made an assignment. The
reason stated by Warren was, that drafts drawn upon one
Bierce, of New York city, for five or six thousand dollars, had
not been honored. These drafts were drawn on the last of
December or first of January. On the 4th of January they
received notice of their dishonor. On the third they drew
checks for a considerable amount, although Warren was
unable to recollect in whose favor they were drawn. On
the 4th of January, before the execution of the assignment,
the firm overdrew their bank account. The firm consisted
of Isaac Warren, of Yates, Orleans county, and Austin E.
Warren and Albert R. Warren, of Batavia. The assignees,
Henry Monell resided in Elba, and Henry B. Crompton
resided in Alexander, Genesee county. The assignment
recited that Warren & Co. were unable to pay their debts,
and divided their creditors into two classes. It was quite
voluminous. The body of the assignment contained sixteen
folios, and the schedule twenty-seven, making in all forty-
three folios. It appeared to be deliberately and carefully
prepared, and was executed by all the parties on the 4th
of January, 1860.

On the 5th of January, the plaintiff telegraphed to Warren & Co., and requested them to send funds for the seed by express that day, as he was hard up for funds. On the 6th he went to Batavia, saw the seed in possession of Monell, except two bags which had been sold. He asked Monell to give up the seed, which he refused to do. The next day he sued the assignee, and instituted proceedings to obtain the possession of the property.

On the trial the plaintiff swore that he had no knowledge that the firm of Warren & Co. was good, and never knew much about their pecuniary circumstances. There being no evidence of a demand of the seed of Crompton, a judgment of nonsuit was directed as to him. At the close of the evidence, the defendant moved for a nonsuit as against Monell, upon the ground that there was no evidence upon the question of fraud to go to the jury, which motion was denied, and to which the defendant's counsel excepted. Thereupon the judge charged the jury, that, if they should find that Warren & Co., with knowledge of their insolvency, and having in contemplation the making of the assignment, purchased the property with the intent not to pay for it, they were guilty of fraud, which would avoid the contract. To this part of the charge there was an exception.

The judge further charged, that, if Warren and Co. did not intend to pay for said property and did intend to cheat the plaintiff out of the purchase price, although they resorted to no act or contrivance for the purpose of misleading the plaintiff, such intent alone would make the sale fraudulent and void. To this there was also an exception.

The defendant's counsel then requested the judge to charge the jury that the mere intent to get the property in question on the part of Warren & Co., without paying for the same, manifested by no fraudulent acts, words or declarations, would not avoid the sale. The judge, in reply, charged the jury that the question of intent was to be considered in connection with all the facts and evidence in the case, and refused to charge further, otherwise than as he had before charged; to which refusal the defendant's counsel excepted.

The jury found a verdict for the plaintiff, assessing the value of the property at $788.37, and the damages at $9.19.

The exceptions were ordered to be heard, in the first instance, at the General Term in the eighth district. Upon the hearing, that court refused to grant a new trial, and ordered judgment for the plaintiff upon the verdict.

*John H. Reynolds*, for the appellant.

*H. C. Day*, for the respondent.

MORGAN, J. The case does not disclose all the circumstances which it is material to know in order to form a satisfactory opinion upon the main question involved in the defendant's exceptions. All we know is, that Warren & Co. ordered the goods on the 29th day of December, 1859, and on the 4th day of January thereafter executed a carefully prepared assignment containing forty-three folios; and that all the parties, residing at different places, were got together the same day to execute it; that they stopped payment on that day, and acknowledged themselves to be insolvent.

Several other facts were proved, but not of a decisive character. The fact that Warren & Co. drew checks on the third to pay a considerable amount of indebtedness; that they overdrew their bank account on the fourth, and stopped payment on that day, because they had just learned that their drafts on Bierce, of New York, for $5,000 or $6,000, had not been honored, are of no particular importance, and furnish no satisfactory evidence that they did not suppose themselves insolvent prior to that time, and contemplated making an assignment. It would have been a fact of great and perhaps decisive importance, if they had been able to show that they had funds in the hands of Bierce, which gave them a right to expect payment of their drafts, by the aid of which they could have avoided a suspension of payments. It may be a question of difficulty to determine whether it was the duty of the plaintiff or defendant to obtain this information from the witness. I do not see why the fact was not proved one way or the other. I think, however, it is the misfortune of

the defendant, for it was for him to show the reasons which justified the failure of the firm on that day—reasons that did not exist on the 29th of December, when they ordered the goods. Nothing appears to have occurred between the 29th of December and the 4th of January, to change the pecuniary responsibility of the firm, except the dishonor of the Bierce drafts; and yet, we have no knowedge that the firm had funds in his hands, or that they expected the drafts to be paid when they were drawn.

In my opinion, it was for the defendants to account for the failure of the firm of Warren & Co., and to show that it was consistent with an honest intention to pay for the goods in question when they purchased them. If we lay these (Bierce's) drafts out of the case (which are not explained in the evidence), there is nothing else which even tends to prove that the firm of Warren & Co. were not hopelessly insolvent on the 29th of December. It may be said that Warren did not know it when he ordered the goods of the plaintiff, but I am of opinion that knowledge may be presumed in such a case. Every man may be presumed to have some general knowledge of his pecuniary condition. If unforeseen circumstances arise, which change his situation, he is the proper party to explain them. In the absence of satisfactory explanations, it is not a violent presumption to infer that a man who stops payment to-day, because he is hopelessly insolvent, must have known and contemplated it six days before.

I am also of opinion that it was proper to prove the usage or course of dealings between the parties. It shows that the plaintiff had a right to place some confidence in the pecuniary responsibility of Warren & Co. Whether the plaintiff contemplated giving a short credit, or whether, by the former course of dealings, he had a right to expect payment on delivery of the goods, does not seem to me to be at all material. In either case the question of fraud would depend upon the *intention* of the defendants' assignors; whether, knowing their insolvency, they purchased the property with the preconceived design of not paying for it.

I do not understand that the question objected to called for the general usage of business between other parties, and as far as it related to the former transactions between these parties, I think the evidence was unobjectionable. If it did not prove that a cash sale was intended, it tended to prove that a short credit only was within the contemplation of the parties. Looking at their former dealings, I think Warren & Co. understood that the plaintiff would deliver the goods without exacting payment on delivery; and their offer to accept a draft at one day's sight, or to send him the funds the first of the next week, was well calculated to put the plaintiff at ease and enable Warren & Co. to complete their arrangements to make a general assignment, if such a thing was then in contemplation.

It will be seen that the judge left it as a question of fact for the jury to decide whether Warren & Co., knowing of their insolvency, made the purchase with a preconceived design of not paying for the property. This I think was correct as a legal proposition; but the question remains, whether there was sufficient *prima facie* evidence of fraud to authorize its submission to the jury. It was claimed by the defendant's counsel that a design of this character may exist without fraud, and hence he requested the judge to charge the jury that if such a design was manifested by no fraudulent acts, words or declaration, it would not avoid the sale. The judge, however, instead of denying the proposition in the abstract, informed the jury that they were to consider the question in connection with all the facts and evidence in the case.

I am of the opinion that the judge was not called upon either to affirm or deny the defendant's proposition. It was mere theory and speculation, without any practical value when addressed to the jury. Unless the evidence furnished grounds for presuming fraud, it was the duty of the judge to have nonsuited the plaintiff. And this brings us back to the only question involved in the exceptions, and that is, whether there was sufficient evidence to authorize its submission to the jury, from which they would have a right to

infer fraud on the part of Warren & Co. in the purchase of these goods.

1. Was there any evidence that they knew they were insolvent and unable to pay for the goods when they ordered them? I have already stated, that, in the absence of any satisfactory explanation of their failure on the fourth of January, 1860, the jury had a right to presume that they were insolvent six days before and that they must have known it.

2. Was there evidence tending to show that Warren & Co. *did not intend* to pay for the goods when they purchased them? This is doubtless the most difficult question to answer, and yet I think it was a question for the jury to decide under the circumstances of this case.

It cannot be said with propriety that a man who is insolvent, and expects to be obliged to stop payment and to make an assignment within a few days, believes that he can pay for a large bill of goods which he has just ordered, and upon which he expects to obtain a short credit. Indeed he has no right to order a bill of goods under such circumstances without disclosing his pecuniary condition.

Here it appeared that the firm of Warren & Co. had dealt with the plaintiff for four years or more, paying him promptly for goods ordered in the same way these were ordered. Just on the eve of stopping payment, on account of actual insolvency, they send another order, knowing or having reason to believe that they would not be able to pay for them. But, says the counsel, this is not so, for the firm stopped payment because their drafts on Bierce of New York were dishonored, which they did not know of on the 4th of January. True, that is the reason given by one of the members. Were the jury bound to believe this, without any evidence that the firm had funds in Bierce's hands? No reason is stated why Bierce dishonored their drafts. If he owed the firm that amount and had failed, it might satisfactorily account for the subsequent failure of Warren & Co. In the absence of any explanation to account for the dishonor of the drafts drawn by Warren & Co. on Bierce, the jury had

a right, I think, to regard the reason given by Warren & Co. for their own failure as a mere pretext. It is said, however, that fraud must be proved and cannot be. presumed. But it may be inferred from competent evidence; and, in the absence of a satisfactory explanation of the failure of Warren & Co. on the 4th of January, 1860, I think there was competent evidence that they were insolvent on the 29th of December, 1859, and that they knew it; and, under such circumstances, they had no right to order goods without any expectation of being able to pay for them at a future day. It is not enough to say that it was perhaps uncertain what day they would be obliged to stop payment. If they were insolvent and might be forced to stop any day, they cannot be permitted to say that they designed in good faith to pay for a large bill of goods ordered by them on the 29th of December, and upon which they expected a short credit of three or four days at least, according to the usual course of dealings between the parties. They could not be indifferent in such a case, but the law will attribute to them a design not to pay unless they can show that they expected to be able to pay, and such expectation must be founded upon *data* which will satisfy the jury that it was honestly entertained.

3. It will not be necessary to refer to the authorities to show that the charge of the judge was a correct exposition of the law as applicable to this class of cases. No doubt can be entertained upon this point. It is supposed, however, by the defendant's counsel, that, by the decisions of this court, an insolvent debtor may purchase goods without being guilty of fraud, if the vendor does not think proper to inquire into his circumstances; and that a mere omission of the insolvent debtor to disclose his insolvency is not evidence of fraud, which will operate to avoid the contract of sale. I am aware that such a doctrine has been enunciated in two or three cases; but on referring to the cases themselves, it will be seen that it rests upon a very narrow foundation. In *Nicholas* v. *Pinner* (18 N. Y., 295), it was decided that the judge erred in refusing to instruct the jury that a merchant

who is perhaps insolvent in April, may make an honest purchase of goods with the expectation of paying for them, although contrary to his expectation, he is compelled to stop payment four months afterward. But, as was said by DENIO, J., in *Brown* v. *Montgomery* (20 N. Y., 293), "it does not countenance the position that a dealer who has been of known standing, but who has suddenly failed in business, can go to those who were acquainted with his former character, but who have not heard of his failure, and innocently purchase their property on credit." So when it is shown that the insolvent purchaser made the purchase just on the eve of suspension and assignment, this fact alone, in the absence of explanatory proof, is sufficient to carry the case to the jury. (*Hennequin* v. *Naylor*, 24 N. Y., 139.)

The question is, whether the purchaser made the purchase with a preconceived design not to pay for the goods. This is certainly the correct rule as between parties who have had former dealings together. Authorities are not wanting which hold that if the purchaser in such a case conceals the fact of his insolvency from the vendor, it is a fraud, and the property is not changed in the hands of the vendee. (*Dewell* v. *Haley*, 1 Paige, 492.) If the purchaser knows himself to be insolvent, and has no reasonable expectation of paying for the goods, it is sufficient evidence of fraud to avoid the sale. (*Powell* v. *Bradlee*, 9 Gill & Johns., 220; Parsons on Contracts, 270, note *w.*)

Every case must however depend in a great degree upon its own peculiar circumstances, and it is impossible to lay down strict rules which can be relied upon to solve future questions. In *Nicholas* v. *Pinner*, the circumstances showed that Pinner made the purchase with an honest expectation of paying for the goods and retrieving his business. In *Hennequin* v. *Naylor*, there was no reason for any such expectation.

As a general rule, it must be left to the jury to say whether the purchaser, in such cases, honestly believed that he could pay for the goods. If he does not believe it, and purchases without disclosing his insolvency, I understand it is for the

jury to determine whether the concealment was fraudulent or not.

Good faith toward those who have dealt with the purchaser upon the faith of his former good standing requires him to disclose his changed circumstances, if they are such as to justify a belief that he will be obliged to stop payment.

The true test is, not whether the vendee in such a case omitted to disclose his circumstances, but whether he honestly intended to pay for the goods at the time of the purchase. This is one question.

Another is, whether the vendee in such case was guilty of a fraudulent concealment, which is perhaps the same question in another form. If the purchaser does not intend to pay for the goods in such a case, his omission to disclose his insolvency would, I think, be evidence from which the jury must find a fraudulent concealment. But an embarrassed merchant may expect to retrieve his condition, and may purchase goods with an honest intention to pay for them, founded upon reasonable expectations. In the latter case, it seems his omission to disclose his circumstances would not be fraudulent unless coupled with some deceit or artifice calculated to mislead the vendor, and throw him off his guard. This is all that was decided in *Nicholas* v. *Pinner;* and it will be seen that it does not aid the defendant in the case at bar, where the purchase was made without any expectation on the part of Warren & Co. of being able to pay, so far as the evidence discloses their situation. Their failure and assignment within six days after their purchase, without any satisfactory explanation, was evidence to be submitted to the jury, from which an inference could be fairly drawn, that at the time of the purchase they had no reasonable expectation of being able to pay the plaintiff for the goods when called upon for that purpose. And if they had no reason to believe that they would be in a condition to pay for the goods when payment was called for, or afterward, the jury may infer that they intended to cheat and defraud the plaintiff out of the same.

The judgment should be affirmed.

Peckham, J.   The law of this case is settled, in my judgment, in *Hennequin* v. *Naylor* (24 N. Y., 139), if it were left doubtful by the case of *Nicholas* v. *Pinner* (18 N. Y., 295, and 23 id., 264).   The decision of the judge, in refusing the nonsuit, and his charge, are fully sustained by that case.

There is no principle that will sanction a fraud in the purchase of goods, although the fraudulent purchaser was enabled to contract for and obtain possession of them without any false statement to the vendor.

To my mind there seems to be an absurdity in holding that such false statement is the only evidence that can establish the fraud.   That is the simple principle upon which alone such a decision can be based, and there is no such principle in the law.

To establish such a fraud a party is no more confined to any particular kind or character of evidence than he is in any other case.   He must prove the fraud to the satisfaction of the jury, by any competent evidence, and if he fail to make out a case sufficient to go to the jury, without evidence of false representation at the time of the purchase, then he must give that evidence or be nonsuited.

To avoid the sale as fraudulent the jury must be satisfied, by the proof, that the purchaser intended, by the purchase, to defraud the vendor; that he never intended to pay for the goods.   That proof will differ necessarily in practice as much as the conduct of men varies.   To hold that affirmative misrepresentation is indispensable to avoid a sale is to declare that that is the only mode in which a fraudulent purchase can be made, that all others are honest and legal.

Take a case: A country merchant has traded in the city for many years, and by his uniform and prompt payments established a high credit.   His city friends, after such experience, no more think of inquiring as to his pecuniary condition than they would of inquiring of their bank whether it would pay their checks when their account was good.   Yet this merchant has been gradually running behind for a year or two.   Finally, he decides to fail, and make money in that way; a large judgment is confessed or recovered; he tells

the sheriff he has not sufficient assets then, but will have soon from New York; goes to New York and buys largely upon his old credit, but affirmatively states no falsehoods; the goods are sent home and immediately levied upon, and he fails as he intended. Were these purchases fair and legal? Did the sheriff get any title by his levy? Very clearly not, as I think we all agree.

In principle that does not differ from the case at bar.

Why did these purchasers stop payment, fail and assign? There is no pretense, in the evidence, that they had lost a dollar unexpectedly or otherwise; a house in New York had not honored their drafts for $5,000 or $6,000; the house had not failed; these purchasers had lost nothing by them, so far as the evidence shows. They overdrew their bank account on the same day they made the assignment.

From its great length, and the care with which it is stated to have been drawn, they must have been actually engaged in making the assignment at the time they overdrew their bank account. Instead of proving their credit, this simple fact unexplained proved another fraud committed, with confessed knowledge of their condition.

It is not necessary to refer more especially to the testimony; enough was shown, in our judgment, to make a case for the jury, and the charge was unobjectionable. The judgment should be affirmed.

All the judges concurring,

Judgment affirmed.