WILLIS G. CHAFFEE *v.* DANIEL G. FORT, as the Assignee of JAMES H. GOLDEY.

(GENERAL TERM, FIFTH DISTRICT, JANUARY, 1870.)

If an insolvent, who is carrying on business with knowledge that he can no longer continue it, and that his property must be surrendered to his creditors, purchases goods upon credit without disclosing the circumstances to the vendor, his concealment thereof is equivalent to fraud, and his assignment of the purchased property for· the benefit of his creditors will pass no title therein to his assignee.

Chaffee *v.* Fort.

And this is so, although the purchase is made in the course of the purchaser's business.

The same rule applies to a banker, who, under like circumstances, receives the money of his depositor.

A banker in business on his own account, but insolvent, and intending an immediate general assignment, unless assisted during the day, receives a sum of money for deposit from one of his depositors who is ignorant of the insolvency, and he makes an entry thereof in the depositor's bank book, but keeps the money in a separate parcel, labeled with the depositor's name, intending to redeliver it if he shall assign; he makes no entry in his own books except a memorandum in his cash book, beneath which he writes the depositor's name; and afterward, on the same day, he assigns his property generally for the benefit of his creditors, and delivers the parcel to the assignee with a request that he will, if he may legally, give it to the depositor.—*Held,* that the assignee took no title to the deposit.

The delivery of the parcel to the assignee, addressed to the depositor for delivery to him, was in effect a delivery to the latter, and after a demand of the amount the assignee was merely his bailee.

THIS was a controversy submitted without action, under section 372 of the Code, upon a case agreed upon by the parties as follows:

"On the 8th day of September, 1869, James H. Goldey was and for several years prior thereto, had been a private banker (though not an individual banker under the statute), keeping an office and doing business in the city of Oswego. His business was buying and selling gold and silver coin, selling drafts, cashing checks, discounting notes and bills of exchange, and receiving money on deposit, subject to the check or call of the depositor.

Willis G. Chaffee, the plaintiff, was a regular depositor at the banking office of said Goldey, and had a bank book in the usual form in which his deposits, when made, were entered.

For six months or more, prior to the 8th day of September, 1869, the said Goldey had been in fact insolvent, and on the evening of the 7th day of September, 1869, he became satisfied of his insolvency, and that he would be unable to continue business for many days unless he received pecuniary aid. He hoped and expected to receive such aid from a friend on the next day, and he decided on the evening of September 7th, that unless he received such aid during the next day,

(September 8th) he would stop business and make an assignment of all of his property in trust for his creditors on the morning of the 9th day of September, 1869.

On the morning of September 8th, he opened his office as usual and received deposits, and paid checks in the ordinary way, until about half-past twelve o'clock in the afternoon of that day, when, at the suggestion of a friend who was aware of his circumstances, he decided to keep in separate packages the deposits of money received after that time, and to mark such packages with the names of the depositors respectively. This was done. The deposits received on the 8th of September, 1869, prior to half-past twelve P. M., were mingled with his other funds as usual.

At half-past twelve P. M. of September 8th, said Goldey wrote in pencil upon the cash book, in his office, in which deposits were entered to the credit of the depositors, and in which the deposits made during the forenoon of that day had been so entered, immediately under the name of the last depositor, these words, to wit : "Half-past twelve P. M. credit no more deposits up." During the afternoon of September 8th, and after half-past twelve P. M., the plaintiff went to the office of said Goldey with his bank book and eighty dollars in currency, and delivered the same over the counter to Goldey, who received the money, entered the amount thereof in said bank book to the credit of the plaintiff, returned the said book to the plaintiff, who took the same and went away.

The said sum of eighty dollars was not placed to the credit of the said plaintiff on the cash book of said Goldey, or any book kept in his office at the time the same was received, nor was the same in any way mingled with the other funds of said Goldey ; but on the contrary, immediately after said plaintiff left the office as aforesaid, the said Goldey made a package of the said identical eighty dollars delivered to him by said plaintiff as aforesaid, wrote upon said package the words and figures following, to wit : "W. G. Chaffee, $80.00," and laid the same away by itself. Subsequently, on the same day, and before executing his assignment for the purpose of making up

his cash account, the said eighty dollars was entered to the credit of said plaintiff on said Goldey's cash book, but below the memorandum in pencil above mentioned. The same course was taken with all of the money delivered to said Goldey by depositors during the said afternoon of September 8th, and subsequent to half-past twelve of that afternoon.

It was the intention of said Goldey, when he received the said eighty dollars from the plaintiff, and made up and marked the package as aforesaid, that the same should be redelivered to the plaintiff in case he, said Goldey, made a general assignment.

During the afternoon of the said 8th day of September, 1869, the said Goldey counted out sums of money equal in amount to the several deposits received by him on that day prior to half-past twelve P. M., placed the sums in separate packages, and wrote upon each package the name of the person whose deposit corresponded in amount with the sum in such package. It was likewise the intention of said Goldey, when he made up and marked the said last mentioned packages, that the same should be delivered to the several depositors whose names were written upon them respectively, in case he made a general assignment. And upon the delivery of his assignment to the defendant, as hereinafter mentioned, the said Goldey also delivered to the said defendant said last mentioned packages of money and also the packages of money delivered to him by depositors during said afternoon, including the package of eighty dollars delivered by the plaintiff as aforesaid, and requested the said defendant to deliver the same to the several depositors whose names were written thereon respectively, if he could legally do so.

The said Goldey did not receive pecuniary aid, as he had hoped and expected, and accordingly at about ten o'clock in the evening of said 8th day of September, 1869, he duly executed an assignment of all his property, real and personal, to said defendant in trust for the creditors of him, said Goldey, making no preferences. And on the morning of the 8th day of September, 1869, the said Goldey duly delivered

the said assignment to the defendant, who duly accepted the same and the trust therein and thereby reposed in him, and duly qualified as such assignee.

The defendant has since kept and now keeps the said packages of money, in the same state and condition they were in when received by him from said Goldey as aforesaid.

The plaintiff did not know, and was not informed in any way until after the execution and delivery of said assignment that said Goldey was insolvent, or that he was or had been financially embarrassed.

Immediately after learning of the execution and delivery of said assignment, the said plaintiff demanded from the said defendant the said package of eighty dollars in money, and the defendant refused to deliver the same.

· The said defendant claims that the said package of money passed to him under the said assignment with the other property of said Goldey, and that he holds the same in trust for all of the creditors of said Goldey.

The said plaintiff claims that said package of money did not pass to said assignee by said assignment, and that the same should be delivered to him (said plaintiff), in pursuance of the intention and request of said Goldey."

*Churchill & Nutting*, for the plaintiff, submitted with other points, the following:

The concealment by Goldey of his insolvency, and his intention already formed to make an assignment, which was consummated the same day, would have made it an act of fraud had he received the plaintiff's money, *with the intent to make it his own.*

The court will not now compel the party against his intention to be guilty of an act of fraud, which it would have been its duty to have set aside had it been done intentionally. Referring to *Gale* v. *Hoyt* (19 Barb., 249); *Mitchell* v. *Worden* (20 Barb., 253).

*Albertus Perry*, for the defendants, contended that the

nature of the contract was determined by what was done at the time of the deposit, and could not be varied by any secret purpose of the depositor not indicated to the plaintiff.

That the character of the contract could not be affected by Goldey's subsequent action in relation to the money.

That the plaintiff intended to make a general deposit, and Goldey evinced an intention to so receive it.

That there being no agreement express or implied by which the identical money was to be kept for the depositor, the deposit was general, and created the relationship of debtor and creditor, citing *Commercial Bank of Albany* v. *Hughes* (17 Wend., 94); *Chapman* v. *White* (2 Seld., 412); *Payne* v. *Gardner* (29 N. Y., 146).

He also contended that even in view of Goldey's subsequent action, by the entry in his cash book for the purpose of making up his cash account, &c., the deposit was not received by him as a special deposit.

And insisted that Goldey being guilty of no fraud in receiving the deposit, was entitled to retain it as a general deposit, and that it passed to his assignee.

Present—MULLIN, MORGAN and DOOLITTLE, JJ.

By the Court—MULLIN, P. J.   It is admitted in the case, that Goldey knew at the time of receiving the money from the plaintiff, that he was, and for several months had been insolvent, and that he had determined to assign his property to an assignee for the benefit of his creditors, within a day or two, unless he should receive assistance, which would enable him to continue his business.

Had he assigned the plaintiff's money on ascertaining that he would not obtain aid he would have been guilty of gross fraud upon the plaintiff. It would have been receiving property on credit not only, but with the intention not to repay it.

Had he purchased property of the plaintiff under such circumstances and then assigned it, the same, or the next day,

for the benefit of all his creditors it would not be seriously contended that the transaction would not have been fraudulent. (*Buckley* v. *Artcher*, 21 Barb., 585; *Durell* v. *Haley*, 1 Paige, 492; *Ash* v. *Putnam*, 1 Hill, 302; *Acker* v. *Campbell*, 23 W., 372.)

I am of the opinion that the time had arrived in the affairs of Goldey when he was bound to disclose to his depositors that he was insolvent.

It was held in *Mitchell* v. *Worden* (20 Barb., 253), that a purchaser was bound to disclose to his vendor, with whom he had had dealings for a great length of time, that he had made an assignment of his property, and that the omission to do so was fraudulent.

While a person is carrying on business apparently solvent, yet in fact insolvent, he is not bound to disclose his pecuniary condition unless required to do so, and his concealment is not of itself fraudulent.

But may he continue to purchase property and be silent, knowing of his insolvency, until he has actually obtained the property of his vendor, and assigned it for the benefit of his creditors? It seems to me that good faith and the protection of those with whom such a man deals, require that the moment he becomes satisfied that an assignment must be made by him, he should disclose his condition.

It is perhaps right that in a country like ours where so much of the business is done upon credit, and by men who are in fact insolvent during a large part of the time they are in business, they should not be required to disclose their condition to those with whom they deal.

They desire to struggle on, and they may ultimately succeed and acquire a fortune. Disclosure of their real condition would be quite likely to destroy their credit and prevent them from further prosecuting business. The country cannot afford to be deprived of the enterprise and energy and perseverance of such men, and hence the wisdom of not imposing on them disclosure, as a duty which it would wish them to perform; but unless they may continue the concealment until they have

not only obtained the property, knowing they cannot pay for it, but actually assigned and disposed of their entire means to pay their liabilities, the duty of disclosure must begin at a point of time when it will protect the seller, and that time is when the purchaser knows he can no longer continue business, and that his property must be applied to pay his debts.

A depositor in a bank is as much entitled to be informed of the condition of the banker with whom he deposits, and has the same claim for the practice toward him of good faith as has a vendor of property, each is entitled to the benefit of the same rules of law.

Goldey did not design to defraud the plaintiff and others, who deposited with him after half-past twelve p. m. of the 8th, September, 1869. Knowing his insolvency and inability to continue business, he kept the plaintiff's deposit separate from his own funds, marked it with the plaintiff's name in order to identify it, with the intention of returning it to plaintiff, should he, Goldey, be unable to continue his business. It is true, this purpose of Goldey was not disclosed to the plaintiff when he made the deposit. The money was handed to Goldey by the plaintiff, with the intention, on his part, of transferring the title to Goldey, and apparently the ordinary contract between a depositor and his depositary was made. The plaintiff had the right to insist upon this contract; but if it was true that Goldey had been guilty of a fraud upon him, in obtaining the deposit, it was competent for plaintiff, when informed of the fraud, to repudiate the contract and sue for his money. Goldey would have been guilty of fraud, had he taken it as a deposit and thus enabled himself to transfer the plaintiff's money to his assignees. This result he avoided by retaining the money, with the intention not to acquire title to it, but to retain it as the property of the plaintiff. The assignee of Goldey obtained no better title to the money than his assignors had, and as he had none the assignee acquired none.

If Goldey had fraudulently attempted to withhold the sums deposited on the afternoon of the 8th September, 1869, from

the assignee, it is possible he might have held them. But Goldey never intended to pass those moneys to the assignee, unless there was some rule of law which took from him all discretion on the subject, and compelled him to pass them over to the assignee.

I know of no such rule of law. It follows if these views are correct, that the delivery to the assignee of the package of money, addressed to and to be delivered to the plaintiff, was a delivery to the plaintiff which revested in him the title to said money, and the defendant was and is the mere bailee of the plaintiff, on demand being made for the amount in said package.

I cannot perceive how this case is to be distinguished from that of *Ash* v. *Putnam* (1 Hill, 302).

In that case, one Dawmus, who was a member of the firm of A. Dawmus & Co., fraudulently purchased of the plaintiff, living in Philadelphia, Pa., a quantity of books on a credit of six months, and the books were shipped to the purchasers at Syracuse, their place of business.

The plaintiffs sent by mail an invoice of the books. Soon after the receipt of it, and before the seizure by the sheriff of Schenectady county, one of the firm of Dawmus & Co. wrote to the plaintiffs, informing them that the firm was insolvent, that the goods were somewhere between New York and Albany, and they were at plaintiffs' orders to dispose of as they pleased. The invoice was returned at plaintiff's request.

The defendant, as sheriff, seized and sold the books on a *fi fa*, against the purchasers, and this action was brought for the wrongful taking. The consent of the partner that plaintiffs might take the goods, was given in January, and the seizure by the sheriff was in March following.

It was held that the sale was rescinded, and the title to the books was in the plaintiffs, and hence that Dawmus & Co., the purchasers had not at the time of the levy any interest in the books which could be taken and sold on execution. The case of *Atkin* v. *Barswick* (1 Strange, 165), cited by COWEN, J.,

in his opinion in the case of *Ash* v. *Putnam*, in principle, is identical with this case and governs it.

I am of opinion that there should be judgment in favor of the plaintiff, and against the defendant for eighty dollars, and interest thereon from the time of demand and refusal.