### Staunton.

RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA v. ASA SNYDER & CO.

| 100 | 567 |
| f106 | 303 |

| 100 | 567 |
| f109 | 278 |

September 18, 1902.

1. DEMURRER TO EVIDENCE—*When Joinder Compelled.*—In a civil action either party may demur to the evidence, and it is the duty of the trial court to compel a joinder therein, unless the evidence is plainly against the demurrant, or it is doubtful what facts should be reasonably inferred from the evidence. Mere conflict in the evidence is no reason for refusing to compel a joinder. Under a former practice a demurrer to evidence operated as a delay of a decision for at least one term, and hence the courts refused to compel a joinder in a very plain case against the demurrant, but as the practice no longer exists, this is no longer a ground for refusal.

2. DEMURRER TO EVIDENCE—*Joinder—Discretion of Trial Court—Review.*—Whether or not a party has the right to demur to the evidence, or may be compelled to join in such demurrer, is a question addressed to the sound judicial discretion of the trial court, subject to review by the appellate court.

3. DEMURRER TO EVIDENCE—*Waiver—Admissions.*—On a demurrer to the evidence the demurrant is considered as waiving all of his evidence in conflict with that of the demurree, and all inferences therefrom except those which necessarily flow therefrom, and as admitting the truth of all of his adversary's evidence, and all just inferences which a jury could properly draw therefrom.

4. APPEAL AND ERROR—*Demurrer to Evidence—Non-Joinder—Judgment in Appellate Court.*—Where the trial court has erred in refusing to compel a joinder in a demurrer to the evidence, and all the evidence has been certified, and this court has everything before it to enable it to do complete justice, and can plainly see not only that joinder should have been compelled, but also what judgment should have been rendered thereon, the case will not be remanded to compel a joinder, but this court will enter such final judgment as

it is manifest should have been entered by the trial court after compelling joinder.

5. FRAUD—*How Charged—Disaffirmance.*—In order to avoid a contract for fraud, the fraud must be plainly averred and clearly proved. When established, it renders the contract voidable at the option of the party injured, but his right to disaffirm must be exercised promptly, without unnecessary delay, the time depending upon the circumstances of the particular case.

6. CONTRACTS—*Fraud—Ratification—How Established—Effect.*—The election to abide by a contract which a party might have avoided may be shown by proof of acquiescence in it, and any act which discloses an intention to abide by the contract will be sufficient to ratify it, provided the acquiescence or ratification was with knowledge of the facts which gave the right to repudiate it. Such election, whether manifested by mere acquiescence or by positive acts, when once made, is, as a rule, irrevocable.

7. CONTRACTS—*Fraud—Competitive Bidding—Very Low Bids.*—The fact that the bid of a contractor upon a work of great magnitude was far below that of the next lowest bidder, is not a circumstance from which a fraudulent purpose must be deduced.

8. SUB-CONTRACTORS—*Liability of Owner for Materials.*—The owner of a building in course of construction is under no obligation to protect the interest of a sub-contractor except where the latter has complied with the statute making the owner liable to the sub-contractor.

9. CONTRACTS—*Fraud—Financial Embarrassment.*—It is not sufficient to establish fraud in the sale of personal property to show that the purchaser was at the time financially embarrassed, though his insolvency is a factor to be considered along with the other circumstances of the case.

10. CONTRACTS—*Materials Furnished by Sub-Contractor—Liability of Owner—Case in Judgment.*—Where a sub-contractor furnishing building materials to a general contractor to be used in the construction of certain buildings upon which the latter was engaged, under a contract by which title to such materials passed to the general contractor upon delivery, became suspicious of the general contractor's solvency, and made inquiries in respect thereto of the owner of the buildings, and the latter truthfully replied that he knew of no trouble that the general contractor was in, whereupon the sub-contractor continued to furnish materials under his contract, but the general contractor soon after failed and surrendered his contract and conveyed all his materials, tools, etc., to the owner of the building, who completed the work, it was held that the sub-contractor, who had taken no steps to avoid his contract with the general contractor on the ground of fraud, and who had not demanded restitution of the property delivered, could not recover

from the owner materials delivered to the general contractor and not paid for by him, nor could he recover damages from the owner in an action of deceit.

11. APPEAL AND ERROR—*Striking Counts from Declaration—Other Sufficient Counts—Harmless Error.*—This court will not reverse the judgment of a trial court for error committed in striking counts from a declaration when every fact and circumstance which could have been given in evidence under said counts were in fact introduced under the remaining counts upon which the trial was had, and this court can see that no other result could have been reached than that which was reached. The error, if any, was harmless.

Error to a judgment of the Circuit Court of Albemarle county, rendered October 16, 1900, in an action of *trover,* wherein the defendant in error was the plaintiff, and the plaintiff in error and others were the defendants.

*Reversed.*

The opinion states the case.

*J. B. Moon* and *Duke & Duke,* for the plaintiff in error.

*W. B. Pettit & Sons,* for the defendant in error.

KEITH, P., delivered the opinion of the court.

Asa Snyder & Company instituted an action on the case in the Circuit Court of Albemarle county against Langley & Company and the Rector and Visitors of the University of Virginia, and filed their declaration containing three counts. The defendants demurred to the declaration as a whole, and to each count thereof. The court sustained the demurrer to the first and second counts, and overruled it with respect to the third count, which is in *trover,* the plaintiffs averring that on the 15th of May, 1897, they were lawfully possessed of certain architectural works, mouldings and castings which were casually lost, and afterwards came into the possession of the defendants by finding, and that the said defendants, well knowing that the property belonged to the plaintiffs, contriving and fraudulently in-

tending to deceive and defraud the plaintiffs, have not yet delivered the property, or any part thereof, although often requested so to do, but have converted and disposed of the same to their own use.

With this declaration the plaintiffs filed a bill of particulars, the items of which, after applying certain credits, amount to $1,627.60. The defendants having pleaded "not guilty," a jury was sworn, and evidence introduced on behalf of plaintiffs and defendants, and, when the introduction of testimony was concluded, the defendants tendered a demurrer to the evidence, in which the plaintiffs refused to join, and the defendants thereupon moved the court to require the plaintiffs so to do, which motion the court overruled, and to this ruling of the court the defendants excepted, and asked that their bill of exceptions, in which the court certifies all the evidence adduced before the jury, might be signed, sealed and enrolled, which was accordingly done.

Those who are curious as to the evolution and development of demurrers to evidence as a part of judicial proceedings in this Commonwealth are referred to the opinion in the case of *C. & O. Rwy. Co.* v. *Sparrow*, 98 Va., at page 630, and cases there cited. It is sufficient for our purposes to refer to the case of *Johnson* v. *C. & O. Rwy. Co.*, 91 Va. 171. After a review of many authorities, it is held in the learned opinion delivered by Judge Riely that: "In a civil case either party has a right to demur to the evidence, except where the evidence is plainly against him, or the court doubts what facts should be reasonably inferred from the evidence demurred to; and where a party has the right to demur, it is the duty of the court to compel the other party to join in the demurrer."

The only reason for the first exception, which we have seen suggested, is that where the evidence is plainly against the demurrrant his motive for interposing a demurrer is in order to delay the decision. *Rohr* v. *Davis*, 9 Leigh, 30; and *Deaton* v.

*Taylor*, 90 Va. 219. Where the case is plainly against the demurrant, the jury would at once find a verdict, and the court render a judgment against him; but, in accordance with the practice which formerly prevailed, where there was a joinder in the demurrer to the evidence, the case was not decided at that term, but the record was made up and a decision and judgment upon it were postponed until the ensuing term. By resorting to a demurrer, therefore, in a plain case the demurrant postponed the day of reckoning for at least one term. It is believed that this practice no longer exists. Where the demurrer is interposed, and there is a joinder in it, the record is at once completed, and judgment rendered upon it without delay. The reason ceasing, the rule should cease, and this qualification of the right to demur to evidence should be no longer regarded. Whether or not in a particular case a party has a right to demur, and it becomes the duty of the court to compel the demurree to join therein, is a question addressed to the sound discretion of the trial court, not an arbitrary but a judicial discretion, the exercise of which may be reviewed upon a writ of error. *Rohr* v. *Davis, supra.*

It remains now to consider whether there is such doubt as to what facts should reasonably be inferred from the evidence demurred to as justified the Circuit Court in refusing to compel a *joinder* on the part of the defendant in error, and this enquiry will involve a consideration of the evidence.

There is evidence proving, or tending to prove, that in the spring of 1896 plaintiff in error advertised for bids for the erection of certain buildings in accordance with plans and specifications prepared by McKim, Meade & White. The contract was awarded to Langley & Co., of Richmond, Va., at the sum of $269,440, they being the lowest bidders by many thousands of dollars. Work was commenced in June, 1896, and Langley & Co. entered into a contract with Snyder & Co., all of the city of Richmond, who agreed to furnish certain structural iron work to be used in the buildings, and to be delivered to Langley &

Co. f. o. b. the cars at Richmond. Snyder & Co. proceeded to furnish this material from time to time during the summer and fall of 1896, receiving partial payments from Langley & Co. as the delivery was made. On December 3, 1896, Snyder & Co. wrote a letter to Dr. Randolph, who was chairman of the Building Committee on behalf of the University of Virginia, saying that the firm had tried to get a special report as to the standing of Langley & Co. through the mercantile agencies, but had failed in their endeavor; that they had a contract for the iron work to be used on the rotunda, amounting to $10,000; that they were ready and anxious to do this work, but that heavy losses during the year had made them cautious. Continuing, they said: "Please advise us how we can secure ourselves. Any information that you can give us will be thankfully received. We hope you will treat this enquiry as purely confidential, as we are very friendly with the contractors, and do not wish to offend them. Hoping you will give this your prompt attention, we remain.

Very truly yours,

(Signed)  ASA SNYDER & CO."

The reply to this letter was dated December 5, 1896, and was written by Robert Robertson, Superintendent of Grounds and Buildings at the University, who informed Snyder & Co. that Langley & Co. "were general contractors for the University of Virginia for all of their building work now in hand, and that the contracts amount to over $269,000; and they have been at work since the 1st of July last. They have given us very fair satisfaction, and we know of no trouble that they are in. Certainly their record has been kept clear, so far as mechanic's liens are concerned. We settle with them monthly on the estimate of our architects, McKim, Mead & White, of New York, withholding 15 per cent. until the satisfactory completion of the whole work. Further than this, we have no information that will be of

service to you, and they being Richmond people, ought to be better known to you than to us. Your letter to us was confidential, and we hope that you will regard this reply as equally so."

In the execution of their contract with Langley & Co., Snyder & Co. furnished them at various times down to March 29, 1897, material of the value of $2,802.60, leaving a balance due of $1,627.60, as shown by the bill of particulars filed with the declaration. The monthly estimates for work done by Langley & Co. varied from $25,000 per month to as much as $40,000 per month, and of these sums they were entitled to draw upon the certificate of the architects 85 *per cent.* Before the 1st of November, 1896, this reserve had been trenched upon to the extent of $3,000, in accordance with an arrangement between Langley & Co. and the University, but there still remained in the hands of the University a large balance of the reserve fund. In February and March, 1897, Langley & Co. found themselves in need of ready money. It was rumored that their sub-contractors were not being promptly paid. The buildings were approaching completion, and Langley & Co. were called upon for a statement as to the condition of the work and their accounts, and the architects refused to issue any certificates until such statements were furnished.

In April and May numerous notices were served on the University by sub-contractors to stop any further payment of money to Langley & Co., and on the 15th of May they surrendered their contract. The University acquiesced in this determination upon the part of Langley & Co., took possession of the tools and material upon the grounds, and relet the work to Ross F. Tucker, who completed it at a cost largely in excess of what would have been due under the contract with Langley & Co., so that there is nothing due by the University to them.

On May 10 Asa Snyder went to the University, and on May 14 wrote Dr. Randolph, stating that his firm were sub-contrac-

tors for iron work under C. E. Langley & Co., general contractors, giving the amount of his bill, and on the same day gave formal notice in writing to the University under section 2479 of the Code of his claim against Langley & Co. for iron sold and delivered to them. During this visit to the University, Snyder called to see Dr. Randolph, who told him, according to Snyder's version of the interview, that if the iron work had not been put upon the buildings he would be paid for it. Dr. Randolph denies this, but upon the demurrer to the evidence Snyder's account is to be taken as true, though the question of law would still remain: Has Dr. Randolph authority to bind the University by such a promise?

On May 7, 1897, Snyder & Co. sent the following telegram to Dr. Randolph: "Please see that our claim for twenty-four hundred dollars for iron work on University building is protected. Letter will follow."

On the same date he wrote the following letter: "We wired you to-day, 'Please see that our claim for twenty-four hundred dollars for iron work on University building is protected. Letter will follow.' We were advised to take this step upon information we received in regard to Langley & Co., general contractors on the University building. We were informed by Mr. Delhaye that the board would meet to-day for the purpose of taking the work out of their hands, and building the same themselves. If such is the case, we respectfully ask that you protect us to the amount of our claim, viz: amount of bill rendered for iron work delivered, $1,627.60. Also partly finished work for second gallery in rotunda building now under construction in our works, approximating $772.40, making total $2,400. We suspended work on this contract until we received your reply. We will further state that our agreement calls for settlement in full for all extra work, and monthly payments on contract work, less 15 per cent., on the 15th of each month. Please advise us as to the condition of affairs, and if we have been correctly informed,

and if you think it will be necessary for us to send up to you a representative to look after this matter. We will treat any information you can give as strictly confidential."

And on May 14 they wrote again as follows: "We wired you on the 7th inst., 'Please see that our claim for twenty-four hundred dollars for work on University building is protected,' which message we now confirm, as sub-contractors for iron work under C. E. Langley & Company, general contractors. The amount of our bill for partly furnished iron work for second gallery in rotunda building now under construction in our works is $772.50, making a total of $2,400."

On May 15, 1897, the University and Langley & Co. entered into an agreement which recites that "by a contract between the parties dated May 26, 1896, the parties of the first part undertook the construction of certain buildings at the University of Virginia, for the parties of the second part, in the fifth clause of which contract it was, among other things, specified that if the parties of the first part failed in the performance of any of the agreements contained in said contract, and the architects named in said contract certified that such failure was sufficient cause for such action, the parties of the second part should be at liberty to terminate the employment of the parties of the first part for the said work, and enter upon the premises and take possession of all materials, tools, etc., and to employ any other person or persons to finish the work and provide the materials therefor at the risk and expense of the said Charles E. Langley & Company." . . . . . . . . . . .

"And whereas, the said parties of the first part do hereby admit and acknowledge in all respects the right and authority of the said parties of the second part to take the action proposed by them with respect to the said contract and work as above stated, and that the said architects have the full right and authority in the premises to make their certificate as aforesaid.

"And whereas, by trust deed of even date herewith, the said

parties of the first part have secured to the said parties of the second part the sum of $4,500 upon the aforesaid materials, tools, etc., which sum was advanced as shown in said trust deed for the purpose of paying the laborers and mechanics of the said parties of the first part, which it was deemed desirable to pay, and said deed of trust being subject to the provisions of this contract and subordinate hereto as a part hereof, and hereto annexed;

"Now, therefore, in consideration of the premises, the said parties of the first part do hereby admit, acknowledge and declare that in all respects the said parties of the second part and the architects aforesaid had and have full power and authority to give the notice and make the certificate aforesaid, and that, after the expiration of three days from this date, the said parties of the second part will have, and they are hereby given and granted, full power and authority to enter upon the said premises and take possession of all the materials, tools, etc., thereon, and to employ any other person or persons to finish the work, and to provide the materials therefor, and in all respects to act in accordance with and be guided by the provisions of the fifth clause of the aforesaid contract."

As of the same date Langley & Co. executed a deed of trust conveying all the property of every kind belonging to them upon the grounds of the University of Virginia or elsewhere in the county of Albemarle to secure the payment to the University of their note for $4,500, given, as stated in the contract just recited, to pay certain laborers and mechanics who had been in the employment of Langley & Co. Under this deed and contract, the property mentioned therein passed into the possession of the University of Virginia.

This material, including the iron work, had been estimated for by architects under the contract with Langley & Company, and constituted a part of the sum upon which Langley & Co. were entitled to draw 85 *per cent.*, in accordance with the thirteenth clause of the contract between Langley & Co. and the University.

On May 14, 1897, Snyder & Co. gave to the University the following notice: "Take notice that, as sub-contractors under C. E. Langley & Co. for doing iron work contemplated by their contract, we have a claim amounting to $1,627.60, as of the 10th of April, 1897, for work and materials furnished in and about the erection and repair of buildings at the University of Virginia under your authority and direction. G. J. Snyder. doing business as Asa Snyder & Co." And finally, on February 19, 1898, gave further notice of the said claim of $1,627.60, with interest from the 10th of April, 1897, and on the same day filed a mechanic's lien in due form in the clerk's office of Albemarle County Court.

This is, we believe, a fair summary of the facts presented by the record. In other words, to state the proposition in the terms of the rule with respect to demurrers to evidence, these are the facts which should reasonably be inferred from the evidence demurred to. There is really no great conflict in the evidence, but if there were, that would constitute no reason for refusing to compel a joinder in the demurrer.

"By the demurrer to the evidence, the party demurring is considered as admitting the truth of his adversary's evidence, and all just inferences which can be properly drawn therefrom by a jury, and as waiving all of his own evidence which conflicts with that of his adversary, and all inferences from his own evidence which do not necessarily result therefrom." *Johnson* v. *C. & O. Rwy. Co., supra.*

By the very terms of the rule governing demurrers to evidence, a conflict of evidence is contemplated, and the conflict is determined by rejecting the parol evidence of the demurrant which conflicts with that of his adversary.

We are of opinion that the court erred in refusing to compel a joinder in the demurrer, and that for this reason its judgment should be reversed.

It now remains for us to determine what judgment this court should enter. We have a bill of exceptions taken to the ruling of the court refusing the defendants' motion to compel the plaintiff to join in the demurrer, and in that bill of exceptions all the evidence adduced at the trial is spread upon the record. We have a verdict of the jury in which the full amount claimed by the plaintiff is awarded, and we do not perceive that the ends of justice would be subserved by reversing this case and remanding it to the Circuit Court, with instructions to compel a joinder in the demurrer, when we have in the record every requisite necessary to a complete adjudication of the controversy. We have the demurrer which was tendered to the evidence; we have the evidence spread upon the record which is of such a character as, in our judgment, required the court to compel a joinder in the demurrer; and we have the verdict of the jury awarding damages to the full amount claimed by the plaintiff in his bill of particulars. To proceed to judgment instead of remanding the case may be regarded as an innovation, but it is one which promotes the administration of justice, can, under the circumstances of this case, do no injustice, and ends the controversy without subjecting the parties to further delay and additional costs. We shall, therefore, proceed to enquire what judgment the court should pronounce.

Defendants in error, in order to recover, must show that a fraud was practised upon them by Langley & Co. when they were induced to enter into the contract under which the property in controversy was manufactured, sold and delivered to Langley & Co.

Fraud must be plainly averred and clearly proven. When established it renders the contract which it taints voidable at the option of him who is injured by it, and this right to disaffirm must be exercised promptly, without unnecessary delay, the time depending upon the circumstances of the particular case. The election to abide by a contract may be shown by proof of ac-

quiescence in it, and any act which discloses an intention to abide by the contract will be sufficient to ratify it, always provided that the acquiescence or ratification was with knowledge of the facts which gave the right to repudiate it, and such election, whether manifested by mere acquiescence or by positive acts, when once made, is, as a rule, irrevocable. These propositions are elementary, and have been asserted in the following cases and others too numerous to cite. *Jeffries* v. *South West Imp. Co.*, 88 Va. 869; *Rouzie* v. *Daingerfield*, 97 Va. 708; 2 Pom. Eq. Jur., sec. 897; Kerr on Fraud and Mistake, 299; *Wilson* v. *Hundley*, 96 Va. 96; *Hurt* v. *Miller*, 95 Va. 32; *Max Meadows L. & Imp. Co.* v. *Brady*, 92 Va. 71; and *Grymes* v. *Saunders*, 93 U. S. 55.

It is not sufficient to establish fraud in the sale of personal property to show that the purchaser was at the time financially embarrassed. To hold that the naked fact that a man was in straitened circumstances when he made the purchase tainted the transaction with fraud, would be to condemn every man who became embarrassed to hopeless ruin. It would paralyze his efforts, compel him to withdraw from business, and deprive him of the only hope of restoring his fortunes. Such a conclusion would be injurious to society, and cruel and ruinous to the individual, and the law in its benignity tolerates no such principle.

It is true that insolvency is a factor to be considered along with other circumstances which may appear in the case, but will not of itself be sufficient to vitiate and destroy a contract.

In the *Anonymous Case*, reported in 67 N. Y. 598, where the defendants, who were bankers, purchased a draft when they were hopelessly insolvent, to their knowledge, the court held the defendants guilty of fraud in contracting the debt, and said their conduct was not like that of a trader "who has become embarrassed and insolvent, and yet has reasonable hopes that by continuing in business he may retrieve his fortunes. In such a case he may buy goods on credit, making no false representations,

without the necessary imputation of dishonesty." Citing *Nichols*
v. *Pinner*, 18 N. Y. 295; *Brown* v. *Montgomery*, 20 N. Y. 287;
*Johnson* v. *Morrell*, 2 Keyes, 655; *Chaffee* v. *Fort*, 2 Lans. 81.
But it is believed no case can be found in the books holding that
a trader who was hopelessly insolvent, knew that he could not
pay his debts, and that he must fail in business and thus disap-
point his creditors, could honestly take advantage of a credit in-
duced by his apparent prosperity and thus obtain property which
he had every reason to believe he could never pay for. In such a
case he does an act, the necessary result of which will be to cheat
and defraud another, and the intention to cheat will be inferred."
This proposition, thus stated, was approved by the Supreme
Court of the United States in *St. Louis etc. Rwy. Co.* v. *John-
ston*, 133 U. S., at p. 576.

If the evidence in this case measured up to the requirements
of the principle thus announced, we should have no hesitation in
holding that the contract under investigation was procured by
fraud. Snyder & Co. and Langley & Co. all resided in the city
of Richmond. When Langley & Co. commenced negotiations
which resulted in the contract with Snyder & Co. they frankly
informed the defendants in error that they were not in a condi-
tion to pay in cash for the property they desired to purchase.
They told Snyder & Co. that they had been accepted as bidders
for the erection of certain buildings at the University. They
were actually engaged in the conduct of other business at the
time, and there is not a word of testimony in this case, not a
fact proven, which shows that at the date of that contract Lang-
ley & Co. were in point of fact insolvent, or that they were
seriously embarrassed. The officers of the University of Vir-
ginia charged with superintending the erection of its buildings,
men of character and intelligence, depose that before the bid
was awarded to Langley & Co. they made diligent enquiry as to
their financial standing. They ascertained no fact that led them
to doubt the solvency of the firm, or its ability to execute the

contract into which it was about to enter, and which involved about $269,000.

The bid at which Langley & Co. were awarded the contract was far below that of the next lowest bidder, the disparity being so great as to excite the belief that their judgment was seriously at fault in making their estimates. This establishes, perhaps, their want of discretion and capacity to conduct successfully an enterprise of such magnitude, but is not a circumstance from which a fraudulent purpose must be deduced.

In December, 1896, Snyder & Co. wrote to the Building Committee at the University to get information as to the financial standing of Langley & Co. They had endeavored without success to ascertain it from mercantile agencies. In reply to their letter of enquiry, Robertson, the superintendent at the University, informed Snyder & Co. that Langley & Co. were general contractors to erect buildings then in course of construction at the University of Virginia; that the contract amounted to $269,000; that they had been at work since the 1st of July; that they had given satisfaction, and that the University had no knowledge of any trouble they were in; that their record had been kept clear of mechanic's liens; that they settled with them monthly on the estimate of their architects, withholding 15 *per cent.* until the satisfactory completion of the whole work.

Each of these representations is shown to be literally true, except that with respect to the retention of 15 *per cent.* That reserve fund had been encroached upon, but there was still in the hands of the University more than enough to meet the demands of Snyder & Co., if it were conceded that they had any interest in it, or that their contract was induced by it. In effect, therefore, it may be said that each and every representation contained in that letter was true. The 15 *per cent.* was withheld, as stated in the letter of Mr. Robertson, until the satisfactory completion of the whole work; and was retained for the benefit of the owner alone. "The owner is under no obligation to protect the interest

of the sub-contractor except where the latter has complied with the law and thus put himself in a position to demand protection from the owner." *Schrieber* v. *Bank*, 99 Va. 257.

During the winter of 1897 Snyder & Co. became uneasy, but continued to furnish supplies under their contract until the last of March. The goods were manufactured and delivered to Langley & Co. f. o. b. the cars at Richmond, in accordance with the contract. When delivered, title passed out of the vendor and vested in the vendee, subject, it is true, to be divested if there was fraud in the procurement of the contract, and Snyder & Co. should promptly disaffirm it and demand a restitution of the goods. We do not think that from the facts proven in this case we can hold that the contract was at any time voidable. If it had been, then Snyder & Co. were required by every obligation of good faith to the University of Virginia to repudiate it without delay. They knew the purpose for which these goods had been ordered. They knew that they were being delivered upon the grounds at the University, and they should have acted without hesitation as soon as facts came to their knowledge which would justify them in a repudiation of the sale, and in demanding a restitution of the property. So far from taking steps to repudiate the contract, or to disclose any purpose to disaffirm it, they called upon the University to aid them in collecting the purchase money when there was no purchase money due them if the contract was to be disaffirmed. They dealt with the University and bargained with it under circumstances which involved the assumption that title to the property had passed out of them into Langley & Co., and from that firm had vested in the University, and yet they uttered no word and did no act indicative of the purpose to disaffirm or to repudiate the transaction, and to demand a restitution of the goods. The final act in the transaction was an effort on their part to secure the purchase price by filing a mechanic's lien upon the buildings in the clerk's office of the County Court of Albemarle. So that, if as an original

proposition there had been fraud in the transaction which gave the right to repudiate it, it has been ratified with the full knowledge of every fact connected with the transaction.

But it is claimed on behalf of defendants in error that, although the conduct of Snyder & Co. may have ratified a transaction voidable for fraud, so as to vest absolutely the property which was the subject of the contract, there still remains the right in Snyder & Co. to recover damages in an action of deceit for the injury they had suffered.

The only plaintiff in error in the case before us is the University of Virginia. It owed no duty involving trust and confidence to Snyder & Co. It had no contractual relations with them. They were strangers to each other. Snyder & Co. called upon the University for information. It was given frankly, fully, and truthfully. There is not the slightest suspicion resting upon plaintiff in error with respect to the procurement of the contract. When Langley & Co. abandoned their effort to complete the buildings, Snyder & Co. had full knowledge of the fact. They had delivered the property in dispute to Langley & Co., and it was upon the premises of the University of Virginia. As we have seen, there was no repudiation of the contract, and no demand for the restitution of the property. It passed under the contract and deed of trust of Langley & Co., with full knowledge of Snyder & Co., into the possession and ownership of the University of Virginia, and still they made no sign indicating a purpose to repudiate. Under such circumstances, an action of deceit could not be maintained.

There is one feature of the case to which we should perhaps allude. Two counts of the declaration were dismissed upon the demurrer, and defendants in error earnestly contend that in this there was error to their prejudice. They went to trial upon the declaration as established by the judgment of the court, and recovered a verdict and judgment for all that was demanded. The two counts which were dismissed set forth substantially as the

ground of action the facts which we have considered as insufficient to warrant a recovery by the plaintiff, but as requiring at the hands of the court a judgment for the defendant. Under the count *in trover*, which alleges a fraudulent conversion by the plaintiff in error of the property of the defendants in error, every fact and circumstance from the beginning to the end of this transaction was brought before the jury and the court, so that in whatever aspect the case may be viewed, no other result could have been reached than that which we have announced, and therefore we can assert with entire confidence that there was no error to the prejudice of the defendant in error in dismissing the first and second counts of the declaration.

Upon the whole case, we are of opinion that the Circuit Court should have compelled a joinder in the demurrer, and should then have rendered judgment upon the verdict of the jury for the plaintiff in error.

*Reversed.*