# Richmond.

## MILLBORO LUMBER COMPANY, INC., v. AUGUSTA WOOD PRODUCTS CORPORATION.

### November 13, 1924.

1. CONTRACTS—*Fraud in the Procurement of Contracts—Bribery of Agent of One of the Parties—Case at Bar.*—In the instant case, a suit for breach of contract by complainant against defendant, defendant alleged fraud in the procurement of the contract through the bribery of defendant's agent by an agent of complainant. It was admitted that complainant's agent paid the agent of defendant $3,000.00 two months and nine days after the contract, and complainant's agent was unable to tell what consideration he or his company received for this $3,000.00. Soon after receiving the $3,000.00 defendant's agent left its employment without collecting the amount due him and went West, and though requested to return has never made his appearance. Under the testimony it might be inferred that complainant's agent had an understanding with defendant's agent that defendant's agent would assist him in securing a contract favorable to complainant and receive compensation therefor, and that when he paid the defendant's agent $3,000.00 he felt that his company had received full value. There were other circumstances tending to show that the transaction was fraudulent.

   *Held:* That the evidence sustained the charge that the contract was procured by fraud and therefore it was voidable.

2. CONTRACTS—*Fraud or Illegality—Waiver—Knowledge of Rights.*—It is well settled in this jurisdiction that a party cannot waive his rights or ratify illegal acts until he knows his rights and intends to waive them, and knows and intends to ratify such acts. He cannot waive or acquiesce in a wrong when ignorant of its existence.

3. CONTRACTS—*Fraud or Illegality—Waiver—Knowledge of Rights—Case at Bar.*—In the instant case, an action by complainant against defendant for breach of contract, defendant pleaded fraud in the procurement of the contract through the bribery of one of its agents, and complainant contended that if there had been such fraud defendant had waived or ratified it.

   *Held:* That while it was true that the officers of defendant viewed the transaction with suspicion and had consulted counsel, who advised

them that there was no sufficient proof of the fraud, yet there was nothing in the record to warrant a holding that defendant had knowledge of, or waived, or ratified the fraud. The fraud could only be established by the testimony of two witnesses, one of whom had disappeared, and the other could not be relied on as a witness to prove the charge of bribery against himself.

4. Rescission, Cancellation and Reformation—*Restitution of Parties to Status Quo—Complete Restitution Impossible—Compensation for Damages.*—Generally to warrant rescission of the contract the court must be able substantially to restore the parties to the position they occupied before entering into the contract, but, where, on account of the act of the adverse party, complete restitution cannot be had, rescission will not be denied and the court will, so far as practicable, require the party profiting by the fraud to surrender the benefit he has received in the transaction. It is immaterial that the *status quo* cannot be literally restored. Equity deals with the substance and not the form, and will grant such relief as far as possible by allowing compensation for the damages sustained by reason of the fraud.

5. Fraud and Deceit—*Relief—Profits Derived from Fraud.*—In equity and good conscience one who, by perpetrating a fraud on another, has derived a profit, cannot be permitted to retain such profit.

6. Fraud and Deceit—*Rescission of Contracts—Damages—Case at Bar.*—In the instant case, a suit by complainant against defendant for breach of a contract for the purchase of a railroad by defendant from complainant, the purchase of timber land by defendant from complainant and for hauling by complainant of defendant's cars, fraud on the part of complainant was established, and defendant assigned as cross error the failure of the lower court to award it damages on account of its purchase of the timber land. The complainant was not notified by the pleadings in advance that any such claim would be made. The contract price covered the timber and the railroad purchased, but it was not apportioned. The amount of profit made by complainant on the sale of the standing timber could not be readily or accurately ascertained.

*Held:* That the cross-assignment of error would be overruled.

Appeal from a decree of the Circuit Court of Augusta county. Decree for complainant. Defendant appeals.

*Affirmed.*

The opinion states the case.

*J. M. Perry,* for the appellant.

*Timberlake & Nelson* and *Fitzhugh Elder,* for the appellee.

WEST, J., delivered the opinion of the court.

For brevity, we will refer to the Millboro Lumber Company, Incorporated, as the Millboro Company, and to the Augusta Wood Products Corporation, as the Augusta Company.

The Millboro Company was engaged in manufacturing lumber in Bath county, Virginia, owning large tracts of timber lands in the adjoining counties of Highland and Augusta, and owning and operating a standard gauge logging railroad, running from Hotchkiss, on the main line of the Chesapeake and Ohio Railroad, to its various timber properties, the terminus being about two miles from Deerfield, in Augusta county.

The Millboro Company's principal office was in Johnstown, Pennsylvania, where its president, J. M. Murdock, resided, and had active charge of its business. H. B. Murdock was secretary and managed its manufacturing operations in Virginia.

The Augusta Company was engaged in the manufacture of barrel staves, and in 1916 purchased, at the price of $130,000.00, about twenty-five thousand acres of timber land near Deerfield, in the vicinity of the timber on the eastern slope of Walker mountain, owned by the Millboro Company, and within a few miles of its railroad terminus, above mentioned. It was estimated that the Augusta Company would have an output of at least three carloads of staves daily, and that the operation of their plant would last from seven to ten years.

J. H. Pew was president and F. M. Brown secretary

of the Augusta Company, with offices in Philadelphia,. Pennsylvania.

On December 19, 1916, the Augusta Company and. the Millboro Company entered into a contract, the· material portions of which are as follows:

(1) The Millboro Company sells to the Augusta· Company all of its main line railroad north of the "Wilderness crossing," reserving the free use thereof (subject to the Augusta Company's use, however), until December 19, 1919, for the purpose of removing its tim-- ber on the western slopes of Walker mountain and at other specified places, and will give the Augusta Com-- pany all possible assistance in securing rights of way for extending this railroad to Deerfield;

(2) Beginning with June 1, 1917, the Millboro Com- pany will haul for the Augusta Company all cars, prop-- erly loaded, delivered to it at the "Y" just south of said "Wilderness crossing," to Hotchkiss and there deliver them to the Chesapeake and Ohio Railroad, at the rate of $15.00 per loaded car, with a minimum delivery stipulated of three loaded cars per day; the Augusta Company will "furnish and deliver to the first party," the Millboro Company, "at said 'Y' during the period of six years, beginning June 1, 1917, and during any extension hereof, an average during said period of six years and during any extension hereof of not less than three loaded cars per day, Sundays and holidays alone excepted, but in the event of the failure of the party of the second part," the Augusta Company, "to load out a sufficient number of cars to average three cars per day during any calendar month, the second party," the Augusta Company, "hereby agrees to pay the first party," the Millboro Company, "on the 15th day of each calendar month, during the existence hereof, for the minimum haul of three cars per day, Sundays and

holidays alone excepted," with the right to apply any excess over the minimum during any calendar month to a deficiency in any other calendar month during the primary term of six years.

"(3) The parties respectively are to be responsible for damage done or demurrage charged to cars while in their possession; all empty cars furnished by the Chesapeake and Ohio for the Augusta Company are to be hauled free of charge by the Millboro Company to the 'Y' at the 'Wilderness crossing;'

"(4) The Millboro Company sells the Augusta Company all its standing timber on the top and eastern sides of Walker mountain, approximately 5,600 acres;

"(5) The Augusta Company within sixty days after the date of the contract, subject to certain cancellation clauses therein expressed, will pay $100,000.00 to the Millboro Company."

The Augusta Company paid the $100,000.00 consideration about February 16, 1917, and on that date a supplementary contract was executed, the object of which was to provide an instrument for recordation.

On December 29, 1919, the Millboro Company filed its bill for an attachment in equity against the Augusta Company, asking damages for the alleged breach of the contract of December 19, 1916, on the ground that the latter company had voluntarily disabled itself to perform. The Augusta Company answered on February 23, 1920, admitting the contract and denying any breach thereof by it. On April 4, 1921, the Augusta Company filed an amended answer and cross-bill charging that the contract had been fraudulently procured by the Millboro Company through a bribe given by it to the Augusta Company's employee, J. T. Zimmerman, and was, therefore, voidable at the election of the Augusta Company, and praying that the contract be rescinded

as far as practicable and that damages to the amount of $15,480.00 be awarded to the defendant for cars never hauled by it, and for general relief.

On June 27, 1921, the Millboro Company filed its answer to the cross-bill in which it admitted that after the execution of the contract in question its secretary, H. B. Murdock, had paid Zimmerman $3,000.00, but denied that this payment was with the knowledge or participation therein of any other officer or member of the Millboro Company, or that the payment was in pursuance of any previous arrangement or understanding with Zimmerman, or that Zimmerman had any part in procuring the execution of the contract. The answer further charged that the Augusta Company and its officers had actual knowledge of the facts constituting the alleged fraud and of the alleged fraud within a very short time after the payment was made, yet with such actual knowledge it had proceeded with the execution of the contract, taking every advantage thereof and thus had fully ratified it and waived the fraud.

The circuit court held that the contract had been fraudulently procured and was voidable at the election of the Augusta Company; that the Augusta Company had not ratified or waived the fraud; awarded damages to the Augusta Company against the Millboro Company in the sum of $20,480.00, abated the attachment and dismissed the Millboro Company's bill.

From that decree this appeal was granted.

Other material facts shown in evidence will be discussed in disposing of the assignments of error.

The plaintiff in error alleges that the circuit court erred:

1. In holding that the contract was procured by fraud, and was voidable.

2. In refusing to hold that in April, 1917, the Au-

gusta Company had knowledge of the fraud of which it now complains, and that it did not thereafter by its conduct condone the fraud, and acquiesce in, ratify and confirm the contract.

3. In awarding *damages* to the Augusta Company, even assuming that said company had not waived the fraud and ratified the contract.

4. In dismissing the bill and denying the Millboro Company the relief prayed by it, damages for the breach of the contract.

### First Assignment.

[1] The Millboro Company admits that H. B. Murdock, its secretary and manager, paid to J. T. Zimmerman, agent of the Augusta Company, on February 28, 1917, two months and nine days after the contract of December 19, 1916, was entered into, a draft for $3,000.00 drawn by the First National Bank of Johnstown on the National City Bank of New York to the order of H. B. Murdock and endorsed by him. Murdock, while under cross-examination as a witness for the Millboro Company, was unable to tell what consideration he or his company received for this draft, except that "Mr. Zimmerman in the first place wanted me to enter into an agreement with them (him)—which I refused to do—on anything that happened there. There was no agreement or anything. After the transaction had been made of the entire proposition, when the thing was closed, I gave him this voucher, this check  *  *  *  It was understood, that is when this thing was finished, he was going to leave the Augusta Wood Products Corporation and I gave him that money."

The Millboro Company contends that, admitting the payment by it of the $3,000.00 to Zimmerman, agent of the Augusta Company, the latter company has failed to connect the payment with the particular transaction complained of, and to show that the fraudulent conduct was the very ground upon which the company acted.

It appears from the evidence that while the contract was prepared in Philadelphia and its details worked out by and between J. H. Pew, acting on behalf of the Augusta Company, and J. M. Murdock, president of the Millboro Company, they secured all their information from H. B. Murdock and Zimmerman, who were on the ground and gave the information and advice necessary to enable Pew and J. M. Murdock to properly execute the contract.

As early as October 31, 1916, Zimmerman was introduced to J. M. Murdock by F. M. Brown and was instructed "to consult with H. B. Murdock and iron out the various wrinkles in connection with the preparing of this contract."

Soon after receiving the check for $3,000.00, Zimmerman left the employment of the Augusta Company, without collecting the amount due him, and went West. Although he was requested by letter to return and get his money, he has never made his appearance.

It may be reasonably inferred, from the testimony of H. B. Murdock, above quoted, that he and Zimmerman had an understanding in the beginning that Zimmerman would assist him in securing a contract favorable to the Millboro Company and receive compensation therefor. And it is reasonably certain that when H. B. Murdock paid Zimmerman the $3,000.00 check, he felt that his company had received full value for it. Manifestly, his desire to cover up a transaction which he knew was steeped in fraud explains Murdock's fail-

ure to give Zimmerman his company's check, instead of the draft of the Johnstown bank on the New York bank. The $3,000.00 was charged to the "timber account" on the books of the Millboro Company. Pew and Brown both testified that they relied upon Zimmerman for information, and that, but for such reliance, the contract would not have been entered into.

This assignment is without merit.

### Second Assignment.

The question involved is what constitutes waiver and ratification by a principal of a fraud perpetrated on him by his agent.

[2] It is well settled in this jurisdiction that a party cannot waive his rights or ratify illegal acts until he knows his rights and intends to waive them, and knows and intends to ratify such acts. He cannot waive or acquiesce in a wrong when ignorant of its existence. As was said by this court in *Montague's Adm'r* v. *Massey*, 76 Va. 314: "No man, even in cases between man and man, can be bound by a waiver of his rights unless such waiver is distinctly made, with full knowledge of his rights which he intends to waive; and knowledge of his rights and distinct intention to waive them, when fully known, must be plainly made to appear."

In *Wilson* v. *Carpenter*, 91 Va. 192, 21 S. E. 243, 50 Am. St. Rep. 824, and in the *Montague-Massey Case*, *supra*, the following from the *Cumberland Coal Co. Case*, 20 Md. 117, 149, is approved: "Confirmation, according to the books, must be a solemn and deliberate act, * * * particularly when the original transaction was infected with fraud, the confirmation of it is so inconsistent with justice and so likely to be accom-

plished with imposition that the courts watch it with the utmost strictness and do not allow it to stand but on the clearest evidence."

The law is clearly and succinctly stated by the United States Supreme Court in *Pence* v. *Langdon*, 99 U. S. 578, 25 L. Ed. 420, as follows: "Acquiescence and waiver are always questions of fact. There can be neither without knowledge. The terms import this foundation for such action. One cannot waive or acquiesce in a wrong while ignorant that it has been committed. Current suspicion and rumor are not enough. There must be knowledge of the facts which will enable the party to take effectual action. Nothing short of this will do. But he may not shut his eyes to what he might readily and ought to have done. The burden of proving knowledge of the fraud and the time of its discovery rests on the defendant."

In *White* v. *American National Life Ins. Co.*, 115 Va. 305, 78 S. E. 582, it is held that "A plaintiff who admits fraud in the procurement of the contract and relies upon a waiver of the fraud by the defendant has the burden of proof to show by clear evidence that the defendant, after the fraud became known to him, waived the same and ratified the contract. The waiver must be distinctly made, with full knowledge of the rights intended to be waived. The fact that a party knows his rights and intends to waive them must plainly appear."

Ratification and acquiescence must be based upon knowledge. They cannot be imputed in the absence of all knowledge of the facts on which they are founded. The law is not so unjust as to hold one to have waived his rights except where, with full knowledge of the facts, he has intentionally and clearly waived them. *Smith* v. *Miller*, 98 Va. 543, 37 S. E. 10; *Hotchkiss* v. *Middlekauf*,

96 Va. 656, 32 S. E. 36, 43 L. R. A. 806; *Rowe* v. *Bently,* 29 Gratt. (70 Va.) 756.

[3] We find nothing in the record to warrant us in holding that the Augusta Company has waived or ratified the fraud complained of. It is true that it learned on April 4, 1917, that J. T. Zimmerman had received from H. B. Murdock a check for $3,000.00. It is likewise true that the officers of this company viewed the transaction with suspicion. But they consulted their counsel and were advised that they had no sufficient proof of bribery to justify them in instituting a proceeding against Zimmerman. The mere passing of a check for $3,000.00 from H. B. Murdock to Zimmerman was not proof of bad faith on the part of Zimmerman. J. M. Murdock, who was in charge of the books of the Millboro Company, testified that he had no knowledge of the fraud until it was extracted from H. B. Murdock on his cross-examination as a witness in the case. The fact of the fraud could be established only by the testimony of Zimmerman or H. B. Murdock. Zimmerman had disappeared, and it was not to be expected that the defendant could, in a proceeding charging H. B. Murdock himself with bribery, rely on him as its only witness to prove the charge against him. It was only by the skillful effort of an able cross-examiner that the witness committed himself to the proposition that he had never had any other transaction of any kind with Zimmerman. Having made this admission, when the check was mentioned to him, there was no answer he could make which would acquit him of the charge of fraud.

The Millboro Company relies with confidence on *Copperthite* v. *Loudoun Nat. Bank,* 111 Va. 70, 76, 68 S. E. 392. This is a fraudulent conveyance case, and the court holds that a person cannot be deemed a *bona*

*fide* purchaser where he has sufficient notice to put him on inquiry, and that in such cases the means of knowing amounts to notice and is equivalent to actual knowledge. Since the instant case involves the question of waiver and ratification, the *Copperthite Case* is not controlling here.

Appellant also cites *Wilson v. Hundley,* 96 Va. 96, 30 S. E. 492, 70 Am. St. Rep. 837, and *University of Va.* v. *Snyder,* 100 Va. 567, 578, 42 S. E. 337.

Referring to these and other similar cases, in *Rhoades v. Banking Co.,* 125 Va. 334, 99 S. E. 677, the court says: "But they all involve cases where the party complaining had *full knowledge* of the *fraud* or misrepresentation prior to the act or conduct relied on by the opposition party to evidence and election to ratify and affirm the contract." (Italics supplied.)

The record discloses no facts and circumstances which show that the Augusta Company had knowledge of the fraud, or from which such knowledge would be imputed to it, prior to August 4, 1920, or that the fraud was at any time waived and the contract ratified.

This assignment is likewise without merit.

### *Third Assignment.*

Assuming that the Augusta Company had not waived the fraud and ratified the contract, it is contended that there was error in awarding damages in its favor, on the ground that rescission requires mutual restitution and not the payment of damages; and that if damages could be decreed the measure of such damages would be the property parted with, which cannot be restored, and not the profits realized from the transaction by the Millboro Company.

[4, 5] It is true, as contended, generally speaking, that the court must be able substantially to restore the parties to the position they occupied before entering into the contract, but, where, on account of the act of the adverse party, complete restitution cannot be had, rescission will not be denied and the court will, so far as practicable, require the party profiting by the fraud to surrender the benefit he has received in the transaction. *Long* v. *Harrison*, 134 Va. 447, 114 S. E. 656; Elliott on Contracts, sections 2434, 2435; *Gates* v. *Cornett*, 72 Mich. 435-6, 40 N. W. 740.

In 13 C. J., section 304-b, the law is stated thus: "When a party has been induced to enter into a contract by false and fraudulent representations, he has several remedies. He may affirm the contract, keeping what he has received under it, and maintain an action to recover the damages which he has sustained by reason of the fraud, or he may set up such damages as a defense or by the way of a counter claim, if sued on the contract by the other party. Affirmance of the contract is not a waiver of the fraud and does not bar the right to recover such damages, but merely bars a subsequent rescission." Citing many authorities, among them *Jordan* v. *Annex Corporation*, 109 Va. 625, 64 S. E. 1050, 17 Ann. Cas. 267, and *Wilson* v. *Hundley*, 96 Va. 96, 30 S. E. 492, 70 Am. St. Rep. 837.

It is immaterial that the *status quo* cannot be literally restored. Equity deals with the substance and not the form, and will grant such relief as far as possible by allowing compensation for the damages sustained by reason of the fraud. In equity and good conscience one who, by perpetrating a fraud on another, has derived a profit, cannot be permitted to retain such profit.

We find no merit in this assignment.

### *Fourth Assignment.*

The fourth assignment of error is based upon the assumption that the contract was valid and binding upon the parties. Having decided that it was void on account of fraud, at the option of the Augusta Company, and that the fraud was not waived or ratified by that company, it follows that the Millboro Company was not entitled to the relief prayed for, and that its bill was properly dismissed.

[6] The appellee assigns as cross-error the failure of the lower court to award appellee damages on account of its purchase under the contract of December 19, 1916, of the Walker mountain timber.

The Millboro Company was not notified by the pleadings in advance that any such claim would be made. The prayer of the cross-bill is that the sum of $15,480.00 paid by the Augusta Company to the Millboro Company, "for cars never hauled by it," be returned to it. The lower court allowed appellee this sum in full, and also an additional sum of $5,000.00 as profit on the cars hauled under the contract for which the Millboro Company received pay. Practically all of this timber had been cut and removed by the Augusta Company and could not be restored to it in kind.

The quantity of timber sold is not known. The $100,000.00 covered the timber and the railroad purchased, but it was not apportioned under the contract. Without the purchase of the Walker mountain timber the Augusta Company could not get railroad transportation for the timber owned by it in that vicinity, unless it built a railroad of its own at an outlay of $100,000.00 to $200,000.00. It may be that the Augusta Company did not pay for the timber any more than it was worth. Under the facts and circumstances disclosed by the

record, the amount of the profit made by the Millboro Company on the standing timber cannot be readily or accurately ascertained.

The cross-assignment of error will be overruled.

The case has been fully and ably argued by distinguished counsel, in the briefs and at the bar, and is not free from difficulty. Upon a careful and painstaking consideration, we find no reversible error in the decree complained of.

*Affirmed.*