## CIRCUIT COURT OF FAIRFAX COUNTY

Steven M. Bershader
and Marguerite F. Godbold

    v.

Prospect Development Co., Inc.,
Alan Seeley,
and Paul Lucas

May 8, 1998

Case No. (Chancery) 149483

BY JUDGE DAVID T. STITT

This matter came before the Court for trial on an Amended Bill of Complaint for declaratory judgment and preliminary and permanent injunctive relief. The Court has reviewed the testimony and evidence presented at trial, Complainant's Memorandum in Lieu of Closing Argument, Defendants' Summary of Law and Evidence, Complainant's Reply to Defendants' Summary of Law and Evidence, and Defendants' Reply Brief, as well as the authorities cited therein. The Court makes the following findings of fact and conclusions of law.

### I. *Findings of Fact*

In early 1993, Steven Bershader and Marguerite Godbold (hereinafter "the Bershaders") began looking for a new home. As naturalists and bird watchers, the Bershaders sought a home on an undisturbed lot with a natural woodland environment. In their search for a lot which would offer them trees, privacy,

and a natural woodland environment, the Bershaders looked in Gainesville, Warrenton, Clifton, and Great Falls, Virginia.

In the course of their search, the Bershaders met Nancy Brown, the Sales Manager for Prospect Development Company, Inc. ("Prospect"), which was developing a subdivision known as "Bennett Farms" or the "Southern Oaks" subdivision[1] in Herndon, Virginia. Ms. Brown[2] showed the Bershaders a plat of the Southern Oaks subdivision which portrayed Lot 23 adjacent to parcel Outlot B, which was designated on the plat as "preserved land."[3] When Ms. Godbold saw the designation "preserved land," she asked Brown what it meant. Brown told the Bershaders the parcel was described as "preserved land" because it had not passed a percolation test for a septic field, that it would not "perk," that a septic field could not be located on it, and accordingly, a house could not be built on the lot.[4] Brown never indicated that there was a possibility that the lot might be built on if a drain field could be sited for septic or if sewer service were extended to the area. Although Brown gave the same sales pitch to all prospective buyers,[5] Brown was aware that the

---

[1]    The "Bennett Farms" subdivision was created by TIPCO Homes, which was foreclosed on by its lending bank, WNB Corp. WNB Corp. subsequently sold a number of the lots in the subdivision to Prospect Development for resale by Prospect, which renamed the subdivision "Southern Oaks."

[2]    Although Nancy Brown possessed no independent authority and could not sell without Prospect's approval, at trial the parties stipulated that Brown was an agent or employee of Prospect and that she acted within the scope of her authority at all relevant times.

[3]    The subdivision plat was developed by Thomas C. Messer, a private contractor who coordinated Prospect's marketing brochures, prepared illustrations for the brochures, and prepared the plat/site plan. Messer's main contact with Prospect was Alan Seeley. Messer testified that the term "preserved land" was not Messer's term, that he could not recall where it originated, but that he knew he had never used the term before or after the preparation of Prospect's Southern Oaks plat. Messer indicated that on the site plan, Lot 4 was originally depicted as "preserved land," but that designation was later removed at Prospect's direction. The designation of "preserved land" never changed for Outlot B, adjacent to Lot 23.

[4]    According to James Scanlon, President of BC Consultants, a civil engineering firm, a percolation test is directed by the health department after a profile hole is used to examine the types of soils and determine the suitability of whether or not soil will "perk." A water percolation test is a test in which water is put in a hole to test the rate at which water can be absorbed.

[5]    Homeowners in the Southern Oaks subdivision testified that Brown showed them the same site plan and provided the same information about the "preserved land" that was conveyed to the Bershaders. Other homeowners who testified included

status of the "preserved land" was significant to the Bershaders because Brown knew of the Bershaders' overriding interest in wildlife and birds and that the Bershaders were looking for privacy.

The Bershaders subsequently met with Alan Seeley, Vice President of Prospect, who was described by Brown to the Bershaders as the "project engineer." Mr. Seeley also told the Bershaders that the lot would not "perk" and could not be built upon. Ms. Godbold even asked Seeley if there were a possibility that the status of the "preserved land" could change and Seeley replied that once something is tested, "that's it," that it could never be built upon.

The Bershaders also met Paul Lucas, an agent of Prospect, who negotiated Prospect's purchase of Bennet Farms and actively participated in the marketing and sale of the lots. When the Bershaders questioned Lucas about the "preserved land," Lucas stated that the lot would not "perk" and therefore could not be built upon.

Prospect asked for a $15,000.00 premium for Lot 23. When the Bershaders requested a reduction in the premium because the lot did not percolate well and a large portion of the lot would have to be cleared for a triple septic field, Seeley denied the request on the ground that Lot 23 bordered "preserved land" and assured the Bershaders that they would have their view and privacy.

At a meeting on May 8, 1993, referred to by the Bershaders as the "exasperation meeting," Mr. Bershader kept pressing Alan Seeley about the status of the "preserved land" until Bershader felt that Seeley was almost "in a rage." Seeley finally asked "what are you afraid of, it's been tested, we've tested it, it can't be developed, it's preserved land, what the hell are you afraid of?" Bershader believed that Seeley was telling the truth because Seeley referred to Fairfax County Department of Health records and said, "if you don't believe me, you can go and check the records, you can check with the Health Department, you can check with the county, you'll just discover I'm right, you'll just waste your time, but go ahead if that's what you want to do."

The Bershaders signed a contract for Lot 23 on May 8, 1993, basing their decision on the representations of Seeley, Lucas, and Brown, as well as documents furnished to them by Prospect Development. Outlot B, titled "preserved land" on the plat, was an integral part of the Bershaders' decision to purchase Lot 23. The Sales Agreement contained an addendum with regard to siting the house near the drain field, away from other houses with minimal

---

James Koutris (Lot 24), Bonnie Vancheri (Lot 14), and Vincent Vilasi (Lot 4).

clearing of the land, provided for six-inch-wide pines to be planted along a bridle path, and another addendum was added substituting holly for the pines.

The Bershaders closed on Lot 23 on October 22, 1993. By siting their house to take advantage of the "preserved land," and by spending approximately $115,000.00 for landscaping to naturalize their entire lot to match the "preserved land," as well as $67,000.00 on the triple septic drain field to create a park-like atmosphere in that area, the Bershaders built a house with the natural woodland environment they desired.

In March 1997, the Bershaders and other residents learned that a Resubdivision Plat had been submitted to Fairfax County seeking to change the status of the "preserved land" to a buildable lot. Residents wrote to Fairfax County officials to protest and sent copies of the plat furnished them by Prospect Development showing the "preserved land." Nevertheless, the County approved the "preserved land," also known as Outlot B, as buildable Lot 31.

On May 5, 1997, the Bershaders noticed tape around the "preserved land" in what appeared to be preparation for its development. On May 7, 1997, a bulldozer arrived at the site. On May 8, 1997, when the bulldozer began clearing trees, the Bershaders asked the operator to stop, and the operator called a representative of Prospect. Alan Seeley arrived at the site and instructed the bulldozer operator to continue clearing trees. The Bershaders came before this Court and obtained a temporary injunction to stop the destruction of trees until further order of the Court. At the conclusion of the trial, the preliminary injunction was extended until June 23, 1998, or until further order of this Court.

Testimony at trial from the Bershaders and other homeowners in the Southern Oaks subdivision established that Prospect and its representatives were informing prospective purchasers in 1993 that Outlot B would not be built upon because it had been tested and found not to percolate. Prospect maintained a deliberate pattern of using the term "preserved land" as a selling feature, and indeed, nearby lots were among the first that were sold. In fact, Outlot B never was "preserved land." Unbeknownst to prospective purchasers, including the Bershaders, Prospect always intended to maximize its number of lots by building on Outlot B.

Evidence presented at trial revealed that the County's record plat contained a note that the "preserved land," marked on the plat as Outlot B, could not be developed unless an appropriate septic site could be located or unless sewer service could be extended to the area. Seeley was aware of the note on the record plat at the time that he represented to the Bershaders that Outlot B did not "perk" and could not be built upon. Brown, however, was not

aware of the note on the record plat and testified that she was "surprised" to learn that Prospect planned to develop Outlot B.

When questioned, Seeley conceded that it was a "fact" that as of the time he told the Bershaders that Outlot B would not "perk," he had no knowledge of any perk test having been performed. Seeley admitted that all "perk" tests on Outlot B were conducted after the sale of Lot 23 to the Bershaders. Seeley also conceded, contrary to his counsel's opening statement, that no new technology was used to get a septic field on Outlot B.[6]

According to the testimony of William Vermilye, an employee of the Fairfax County Health Department, no water percolation test was performed on Outlot B until 1996.

Seeley testified that his definition of "preserved land" is that it is "left natural — not built on" and "never developed." Seeley conceded that he saw something wrong with using the term "preserved land" with regard to Outlot B. Although Seeley denied using the term "preserved land "in his individual capacity, when asked if Prospect had used the term, he responded, "yes, they did."[7] Seeley also denied handing out a plat with the term "preserved land" by saying that he never personally did so, but it is clear that such a plat was being handed out by Prospect to prospective buyers. Seeley did agree that on every single plat distributed by Prospect from at least March, 1993, to November, 1994, Prospect referred to the outlots as "preserved land." The other outlot was Outlot A, adjacent to Lot 4. Outlot A also bore the label "preserved land."

Vincent Vilasi purchased Lot 4 in the Southern Oaks subdivision, adjacent to what was labeled as "preserved land" on Outlot A. Although Brown never told Dr. Vilasi that Prospect did not own Outlot A, Vilasi subsequently learned that the individual living on Lot 1 actually owned Lots 1, 2, and 3, as well as Outlot A, notwithstanding the erroneous and misleading depiction of Outlot

---

[6] In his opening statement, counsel for Defendants indicated that new technology was used to get a septic field on Outlot B. However, Seeley admitted that the technology known as Lateral Groundwater Movement Interceptor, or LGMI, was not used to get a septic field on Outlot B. Seeley also conceded that LGMI was not a new technology and that it had been around since 1977.

[7] The Court found Seeley's credibility as a witness to be poor. His testimony was disingenuous at times, particularly when he attempted to distinguish between statements made in his individual capacity as opposed to statements or actions taken by Prospect, of which he was Vice President. In testimony which the Court found to be incredible, Seeley denied that he personally referred to Outlot B as "preserved land" in conversations with the Bershaders but did not deny that Prospect had referred to Outlot B as "preserved land." The Court also found that Seeley manifested a cavalier attitude about lying to prospective purchasers and lenders.

A on the plat which Prospect handed out to prospective purchasers. Seeley agreed that when Vilasi settled on Lot 4 in November, 1994, Seeley knew that another individual owned Outlot A and agreed that Prospect had no right to represent Outlot A as "preserved land" when it did not even own the property.

According to Bonnie Vancheri, owner of Lot 14 in the Southern Oaks subdivision, Seeley stated that the "preserved land" was officially platted to the county as preserved land, and although Prospect owned it, if it tried to build on it, the homeowners in Southern Oaks could bring a lawsuit against Prospect.

Although Seeley denied having this conversation with Ms. Vancheri regarding Outlot B, the Court found Vancheri's testimony to be credible and adopts her testimony on the issue. Furthermore, Seeley denied the discussion with Thomas Messer regarding removing the term "preserved land" from Lot 4. Again, the Court rejects Seeley's testimony on that issue as not credible.

Prospect Development's course of conduct in the process of acquiring the Bennett Farms lots also was instructive. On behalf of Prospect, Paul Lucas wrote to the seller, WNB Corp., concerning the feasibility study on the Bennett Farms lots. In a letter dated July 22, 1992, Lucas described Lots 6 and 16 as "totally worthless," indicated that the lots "will not accommodate any type of home," and offered to pay $20,000.00 each for the lots so that they could be passed on to prospective purchasers as additional ground. In a document sent to Central Fidelity Bank dated October 13, 1992, Prospect described Lots 6 and 16 as "questionable" building lots. By April 1993, both Lots 6 and 16 had houses built on them with septic systems.

Outlot B, the "preserved land," was included in the deal by TIPCO *at no cost to Prospect*. The settlement statement did not even make reference to Outlot B, but the deed from TIPCO to Prospect did. Notwithstanding the fact that Prospect did not pay for Outlot B, Prospect has received property bills and paid property taxes on Outlot B as a buildable lot since 1992, when Prospect acquired Outlot B.

William C. Harvey, an expert real estate appraiser and broker, testified that Outlot B has always been coded as "B," which stands for a buildable-average lot, in the tax records of the Fairfax County Department of Real Estate Assessments. Mr. Harvey further testified that Outlot B has been coded as "B" since the record plat was first recorded among the land records.

Mr. Harvey testified that the market value of the Bershader property on Lot 23 prior to the partial clearing of trees on Outlot B by Prospect was $580,000.00, whereas after the tree clearing, it was worth $546,000.00. Mr. Harvey based his analysis on the cost to cure, a nationally-recognized appraisal method in this type of project. Mr. Harvey testified that the difference in value

represents the cost to replace the destroyed trees. Mr. Harvey explained that the replacement values were based on matching the tree species but that the replacements would be smaller, shorter, and skinnier trees. Mr. Harvey indicated that he reached the $34,000.00 figure by following the specific criteria in the Guide for Plant Appraisals. Mr. Harvey solicited estimates from local nurseries for the identified 51 species of trees and included the costs of purchasing, transporting, and planting the replacement trees.

Paul Lucas[8] testified that the current status of Outlot B is that it is security for an $85,000.00 deed of trust. Mr. Lucas explained that Prospect Development Company presented the land to the lender, Central Fidelity Bank, as building Lot 31 which had been approved in 1996. Mr. Lucas conceded that the bank thought it was making an $85,000.00 loan on a building lot in a residential subdivision on which it could reasonably expect Prospect would construct a house. Mr. Lucas indicated that he did not know if Central Fidelity was aware of the representations that had been made to the purchasers in the subdivision about the status and nature and character of the lot.

The Bershaders had no knowledge that the record plat provided for development on the "preserved land" nor did they have any idea about the possibility of future development based on the assurances they received from Prospect Development, particularly from Brown, Seeley, and Lucas. Had the Bershaders known that no water percolation test had been performed on the "preserved land," they would not have purchased Lot 23 without further investigation and would have pursued the issue with the County.

## II. *Conclusions of Law*

### A. *Actual Fraud*

Count I of the Amended Bill of Complaint alleges that the Defendants intentionally and knowingly made false representations of material facts to the Bershaders by informing them that the adjoining "Preserved Land" "would not percolate," "could not be built upon" and "can never be developed."

To establish actual fraud, the Bershaders must show by clear and convincing evidence that a false representation of a material fact was intentionally and knowingly made with the intent to mislead. *Nationwide Mut. Ins. Co. v. Hargraves*, 242 Va. 88, 92, 405 S.E.2d 848, 851 (1991). In

---

[8] The Court found Paul Lucas' credibility to be extremely poor. Lucas' contributions at trial were minimal as he professed not to recall an inordinate number of matters concerning his role in this transaction.

addition, the Bershaders, as the injured party, must have been damaged as a result of their reliance on the misrepresentation. *Id.* Actual fraud may involve a false representation or a deliberate nondisclosure:

> For purposes of an action for fraud, concealment, whether accomplished by word or conduct, may be the equivalent of a false representation because the concealment always involves deliberate nondisclosure designed to prevent another from learning the truth. A contracting party's willful nondisclosure of a material fact that he knows is unknown to the other party may evince an intent to practice actual fraud.

*Van Deusen v. Snead*, 247 Va. 324, 328-29, 441 S.E.2d 207, 209 (1994); *Spence v. Griffin*, 236 Va. 21, 28, 372 S.E.2d 595, 598-599 (1988).

The Court finds that the Bershaders proved by clear and convincing evidence that Prospect Development Company knowingly and intentionally misrepresented that Outlot B was "preserved land" by stating that Outlot B could not, did not, and would not percolate, when in fact no percolation test had been conducted at the time those representations were made. At the time the statements were made, Defendants knew them to be false because Prospect and its representatives represented that Outlot B could not and would not be developed at the same time Prospect was paying taxes on Outlot B as a buildable lot with the clear intent to develop Outlot B at a future date, just as Prospect had developed other lots which it originally described as "worthless."

Defendants possessed unique expertise and knowledge regarding the status of Outlot B. In particular, Alan Seeley admitted that he knew that no perk test had been conducted prior to the times he represented to the Bershaders that a perk test had been conducted.

Seeley's concealment of the status of Outlot B was a deliberate nondisclosure designed to mislead the Bershaders and to induce them to enter into the Contract and purchase the property. Seeley deliberately challenged Steven Bershader's persistent questions about the status of the "preserved land" by asking Bershader "what are you afraid of?," implying that Prospect was not hiding any information from the Bershaders. Seeley knew what the records would reveal when he mockingly challenged the Bershaders to examine the Health Department records. Seeley's statements were intended to preclude the Bershaders from examining the records by assuring them that the records would reflect his representations.

As Defendants intended, the Bershaders were induced to purchase Lot 23. As the Bershaders testified, the designation of "preserved land" adjacent to Lot

23 on the subdivision site plan was an integral part of their decision. When the Bershaders closed on Lot 23 in October 1993, they believed that it would offer them the view, privacy, and natural wooded environment which they sought.

The Court holds that Prospect Development Company, Inc., Alan Seeley, and Paul Lucas engaged in actual fraud against Steven Bershader and Marguerite Godbold by intentionally and knowingly making statements with the intent to mislead the Bershaders into purchasing Lot 23 and that the Bershaders were misled into purchasing a lot which they believed bordered "preserved land."

## B. *Constructive Fraud*

Count II of the Amended Bill of Complaint alleges that Defendants innocently or negligently made false representations of material facts to the Bershaders by informing them that the adjoining "Preserved Land" "would not percolate," "could not be built upon," and "can never be developed." Count II also alleges that Defendants had unique expertise and knowledge regarding the facts which were made to induce the Bershaders to purchase the property and that the Bershaders relied upon the misrepresentations.

The elements of constructive fraud in Virginia are set out in *Bergmueller v. Minnick*:

> In order to establish constructive fraud, one must prove the following by clear, cogent, and convincing evidence: (1) that there was a material false representation, (2) that the hearer believed it to be true, (3) that it was meant to be acted on, (4) that it was acted on, and (5) that damage was sustained.

*Bergmueller v. Minnick*, 238 Va. 332, 337, 383 S.E.2d 722, 724 (1989); *Nationwide Ins. Co. v. Patterson*, 229 Va. 627, 629, 331 S.E.2d 490, 492 (1985).

The Court finds that Prospect Development Company, Alan Seeley, and Paul Lucas engaged in constructive fraud.

First, Prospect made a material false representation when it identified Outlot B as "preserved land" in its marketing materials and told the Bershaders that Outlot B was "preserved" and could not and would not be developed. Although Alan Seeley denied that he was responsible for directing Thomas Messer, the artist hired by Prospect to assist with its marketing efforts, Seeley acknowledged that Prospect, as a corporate entity, directed that the plat portray Outlot B as "preserved land." In doing so, Prospect's intent was to induce the

purchase of premium lots, such as the Bershaders'. Although Prospect's sales representative, Nancy Brown, did not know at the time that what she was saying was wrong, it is clear that Prospect knew that its portrayal of the lot as "preserved land" was wrong. Ms. Brown, acting as an agent of Prospect, falsely represented to the Bershaders and other prospective buyers that Outlot B was "preserved land." Furthermore, Seeley testified that at the time he told the Bershaders that the land did not perk, Seeley had no knowledge of any perk test ever having been done on the property. Prospect fraudulently induced the Bershaders to purchase Lot 23 by making fraudulent misrepresentations of facts concerning the present and future status of Outlot B. At the time the representations were made concerning Outlot B in the spring of 1993, no percolation test had been conducted on Outlot B by Prospect or by anyone else.

The Court finds that the statements made by Prospect Development Company and its representatives were "unambiguous representations of the present quality or character of the property and, thus, are representations of fact and not mere expressions of opinion." *Mortarino v. Consultant Eng. Services*, 251 Va. 289, 294, 467 S.E.2d 778, 781 (1996). As the Virginia Supreme Court explained in *Mortarino*:

> We have not, however, established a bright line test to determine whether false representations constitute matters of opinion or statements of fact. Rather, each case must in a large measure be adjudged upon its own facts, taking into consideration the nature of the representation and the meaning of the language used as applied to the subject matter and as interpreted by the surrounding circumstances.

251 Va. 289, 293 (1996); *Packard Norfolk, Inc. v. Miller*, 198 Va. 557, 562, 95 S.E.2d 207, 211 (1956). Under the circumstances of this case, the statement that the "preserved land" "did not perk" constituted a factual misrepresentation of the present quality of the land rather than a mere expression of Prospect's opinion.

Second, the Bershaders believed Prospect's representations. When the Bershaders initially met with Nancy Brown, they indicated that they were interested in Lot 23 because Lot 23 bordered the "preserved land." Had the Bershaders not believed Prospect's representations, they would not have purchased Lot 23 in the Southern Oaks subdivision. Prospect represented to the Bershaders that the "preserved land" adjacent to Lot 23 would "never be developed" and Lot 23 would give the Bershaders the "view and privacy" that

they sought. Believing those representations to be true, the Bershaders purchased Lot 23.

Third, Prospect intended that buyers would act on the representation that the land was "preserved" and would not be built on. Testimony at trial revealed that Prospect engaged in a course of conduct of representing that certain lots would not be built on, but later building on the lots. For example, lots which Prospect once described as "totally worthless" were later developed. Prospect's intent to mislead the Bershaders is evidenced by Defendants' pattern of fraudulent conduct. Prospect's representatives fraudulently concealed the true condition of Outlot B. Prospect classified the land as "preserved land" in order to obtain higher lot premiums. In fact, the Bershaders' request for a reduction in the lot premium for Lot 23 was denied on the grounds that Lot 23 bordered "preserved land."

Fourth, the Bershaders acted on Prospect's representation that the land was "preserved." The Bershaders relied on Prospect's representations and did not check the veracity of Seeley's statements against the Department of Health records. The Bershaders paid Prospect a $15,000.00 lot premium for Lot 23. The Bershaders would not have purchased Lot 23 had they known that Prospect intended to develop the "preserved land." The Bershaders based their decision to purchase on Prospect's representation that Lot 23 would provide the wooded and natural environment that they were specifically looking for.

Finally, the Bershaders sustained damages as a result of Prospect's fraudulent misrepresentations. The Bershaders paid a $15,000.00 lot premium for Lot 23, situated adjacent to the "preserved land." Prospect represented that the "preserved land" would never be built upon. However, in May 1997, Prospect initiated clearing the land in preparation for development. The Bershaders had situated their house and landscaped their property in order to take advantage of the "preserved land." When Prospect directed a bulldozer to begin clearing trees on Outlot B, the Bershaders suffered a $34,000.00 loss in the value of their property, according to the testimony of real estate appraiser and broker William C. Harvey.

The Bershaders paid a $15,000.00 lot premium to secure Lot 23 because it was adjacent to "preserved land." Once Prospect began development efforts on Outlot B, the purpose of the $15,000.00 lot premium became a sham. If Outlot B remains undeveloped as "preserved land," then the Bershaders are not entitled to recover the $15,000.00 lot premium. However, Prospect's attempt at developing Outlot B resulted in a diminution in value of the Bershader property. The partial clearing of trees reduced the value of the Bershader property by $34,000.00, which the Bershaders are entitled to recover to compensate them for their loss and restore them to the position they

were in prior to this litigation. Therefore, the Court orders the Defendants to pay $34,000.00 to the Bershaders, and the Bershaders are ordered to use those funds to restore Outlot B to the condition it was in immediately prior to the tree clearing.

## C. *Caveat Emptor Does Not Apply*

The doctrine of *caveat emptor* does not apply here. The Bershaders were under no duty to investigate the Department of Health or land records to determine the truth of the Defendants' statements. Purchasers of property have no duty to investigate the veracity of misrepresentations made to induce them to purchase.

> In Virginia, one cannot, by fraud and deceit, induce another to enter into a contract to his disadvantage, then escape liability by saying that the party to whom the misrepresentation was made was negligent in failing to learn the truth. The doctrine of *caveat emptor* "affords no protection to a seller who makes false representations of a material fact, constituting an inducement to the contract, on which the buyer had a right to rely."

*Boykin v. Hermitage Realty*, 234 Va. 26, 30, 360 S.E.2d 177, 179 (1987), *quoting Nationwide Ins. Co. v. Patterson*, 229 Va. 627, 631, 331 S.E.2d 490, 492 (1985); *Watson v. Avon Street Ctr.*, 226 Va. 614, 618, 311 S.E.2d 795, 798 (1984) (other citations omitted).

Because the Defendants assured the Bershaders on repeated occasions that there was nothing to worry about, the Bershaders did not perform any investigation regarding the misrepresentations. "[A] very important exception to [caveat emptor] is that the seller 'must not say or do anything to throw the purchaser off his guard or to divert him from making the inquiries and examination which a prudent man ought to make'." *Armentrout v. French*, 220 Va. 458, 258 S.E.2d 519 (1970) (*quoting Horner v. Ahern*, 207 Va. 860, 864, 153 S.E.2d 216, 219 (1967)); *Bergmueller v. Minnick*, 238 Va. 332, 383 S.E.2d 722 (1989).

In this case, the Defendants' statements purposely and intentionally diverted the Bershaders from making inquiries and examining the records related to Outlot B. Therefore, the Court holds that under these circumstances, the doctrine of *caveat emptor* does not apply, and the Bershaders were under no duty to undertake an independent examination of the County's records.

### D. *Easement by Estoppel*

Count III of the Amended Bill of Complaint asks for a declaration that the Bershaders own a negative restrictive easement in the "preserved land" because based on the Defendants' representations and inducements, the Bershaders purchased Lot 23, performed extensive improvements, and enjoyed and used the view and privacy afforded by the easement.

Virginia has long recognized an easement by estoppel as a property interest. *Oney v. West Buena Vista Land Co.*, 104 Va. 580, 584, 52 S.E. 343, 344 (1905). "Easements are sometimes created by *estoppel*; for example, if the vendor of land actually or constructively makes *representations* as to the existence of an easement appurtenant to the land sold to be enjoyed in land which the vendor has not sold." *Walters v. Smith*, 186 Va. 159, 172, 41 S.E.2d 617, 623 (1947) *quoting Minor on Real Property*, vol. 1, § 104 (Ribble, ed., 1928) (emphasis in original).

In *Oney v. West Buena Vista Land Co., supra,* the complainants sued to establish their easement rights in a bridge on the grounds that they and others similarly situated purchased their property based upon the good faith representations of the existence of the bridge. The court granted the complainants an implied easement in the bridge because it "was one of the most important if not the principal inducement to them to buy." *Id.* at 584. In *Jones v. Beavers*, 221 Va. 214, 219, 269 S.E.2d 775, 778 (1980), the Virginia Supreme Court stated that "it is clear that estoppel is the true basis of the action [in *Oney*]."

The facts in *Oney* are substantially similar to the current matter because the principal, if not the sole, reason the Bershaders purchased Lot 23 was the inducement from Defendants that their home would be adjacent to and enjoy a view of the "preserved land" for which they paid a lot premium.

The Court awards an easement by estoppel on Outlot B in favor of the Bershaders' property on Lot 23. The Court orders Prospect Development Company to record the easement in favor of the Bershaders in the chain of title to both Lot 23 and Outlot B.

### E. *Permanent Injunctive Relief*

As set forth above, Defendants' representations concerning the "preserved land" give rise to an easement by estoppel. The only way to protect the easement is by permanent injunctive relief. "The function of [a] prohibitory injunction is not to repair or penalize a wrong previously consummated, but either to maintain the status quo, to restrain the continued commission of an

ongoing wrong, or to prevent the future commission of an anticipated wrong." *WTAR Radio-TV v. Virginia Beach*, 216 Va. 892, 894-95, 223 S.E.2d 895, 898 (1976). Whether the extraordinary remedy of an injunction should be employed to prevent the future commission of an anticipated wrong depends upon the nature of the wrong and the likelihood that the wrong will be committed. *Id.*

Because the Bershaders stand to suffer additional irreparable injury based on the reasonable probability that Prospect plans to develop Outlot B, the Court finds good cause to grant the Bershaders a permanent injunction against the development of Outlot B by Prospect Development Company. Prospect Development Company, Inc., Paul Lucas, Alan Seeley and their successors in interest are permanently enjoined from developing Outlot B.

## F. *Breach of Contract*

Count IV of the Amended Bill of Complaint alleges that Prospect Development Company breached the Sales Agreement with the Bershaders. The Bershaders ask that the Sales Agreement be specifically enforced to effect the intent that the Bershaders purchased a lot adjacent to "preserved land." The Bershaders' request is granted to the extent of the Court's finding of an easement by estoppel and award of permanent injunctive relief in favor of the Bershaders.

## G. *Deed of Trust*

Paul Lucas testified that Outlot B, labeled by Prospect as "preserved land," adjacent to Lot 23, is currently security for an $85,000.00 deed of trust. Lucas explained that Prospect Development Company presented the land to the lender, Central Fidelity Bank, as Outlot B. Mr. Lucas conceded that the lot was presented as building Lot 31.

The Court directs Prospect Development Company to take the necessary steps to ensure that Central Fidelity Bank releases the $85,000.00 deed of trust on Outlot B, also known as Lot 31, within 30 days after entry of a Final Order in this case.

## H. *Attorney's Fees*

This Court previously bifurcated the issue of attorney's fees until after the trial on the merits. The Bershaders request attorney's fees as part of their claim for complete relief in equity, as they seek to be restored to the position they

enjoyed but for the Defendants' fraud. Virginia follows the "American rule" that attorney's fees are not recoverable by the prevailing party unless provided for by contract or by statute. However, this Court has held that attorney's fees are permitted in a fraud case under the Court's equitable powers. *Anderson v. Sharma*, 38 Va. Cir. 22 (1995) (Chief Judge Jamborsky presiding). "Equity deals with the substance and not the form and will grant such relief as far as possible by allowing compensation for the damages sustained by reason of the fraud." *Millboro Co. v. Augusta Corp.*, 140 Va. 409, 421, 125 S.E. 306, 310 (1924).

Accordingly, as this case invokes the equitable powers of the Court, the Bershaders are entitled to seek reasonable attorney's fees for prosecuting this action. However, because this Court previously bifurcated the issue of attorney's fees, the presentation of testimony on the issue of attorney's fees as well as any expert testimony concerning reasonableness will be addressed at a separate hearing.

I. *Damages*

As to Count I (Actual Fraud), Count II (Constructive Fraud), and Count IV (Breach of Contract), the Court has awarded the Bershaders an easement by estoppel and permanent injunctive relief. Defendants, Prospect Development Company, Inc., Alan Seeley, and Paul Lucas have been ordered to pay $34,000.00 to the Bershaders within 30 days of the date of a Final Order for the replacement of trees which were cleared from Outlot B. Defendants have been enjoined from developing Outlot B and have been ordered to record the easement among the land records of this County, as well as obtain the release of the Deed of Trust for building lot 31, currently held by Central Fidelity Bank.

The Bershaders requested compensatory damages in the amount of $500,000.00 and punitive damages in the amount of $350,000.00. The Court finds that an additional monetary award of compensatory damages is not necessary given the relief awarded by the Court.

As to punitive damages, such damages may be recovered where there is misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard for the rights of others. *Giant of Va., Inc. v. Pigg*, 207 Va. 679, 685, 152 S.E.2d 271, 277 (1967); *Puent v. Dickens*, 245 Va. 217, 219, 427 S.E.2d 340, 342 (1993). Although the Bershaders established the elements of actual fraud, the Court holds that the Bershaders did not establish that Prospect or its representatives engaged in conduct which evidenced actual malice or recklessness towards the Bershaders. Therefore, although the

purpose of punitive damages is not so much to compensate the plaintiff but rather to punish the wrongdoer and to warn others, the Court finds that the Bershaders are not entitled to an award of punitive damages.